IN THE MATTER OF STEVEN S. FRIEDMAN AN
ATTORNEY AT LAW.

April 7, 1987.

ORDER

This matter having been presented to the Court on the recommendation of the Disciplinary Review Board that the discipline to be imposed upon STEVEN S. FRIEDMAN, of ELMWOOD PARK, who was admitted to the bar of New Jersey in 1970, be limited to the time he has served since his temporary suspension from the practice of law on February 13, 1986, and

STEVEN S. FRIEDMAN having waived oral argument before this Court and having moved for his immediate restoration to the practice of law, and good cause appearing;

It is ORDERED that the Court adopts the report of the Disciplinary Review Board; and it is further

ORDERED that the suspension of STEVEN S. FRIEDMAN from the practice of law shall continue until the further order of the Court; and it is further

ORDERED that STEVEN S. FRIEDMAN is eligible to apply for his restoration to the practice of law under *R.* 1:20–11(h); and it is further

ORDERED that STEVEN S. FRIEDMAN is restrained and enjoined from practicing law during the period of his suspension; and it is further

ORDERED that respondent reimburse the Ethics Financial Committee for the appropriate administrative costs arising out of the prosecution of this disciplinary matter; and it is further

ORDERED that STEVEN S. FRIEDMAN continue to comply with Administrative Guideline No. 23 of the Office of Attorney Ethics dealing with suspended attorneys; and it is further

ORDERED that respondent's motion for immediate restoration to the practice of law is denied.

## SUPREME COURT OF NEW JERSEY

This matter is before the Board on a Notice of Motion for Final Discipline filed by the Office of Attorney Ethics. This is based on respondent's guilty plea to violations of *N.J.S.A.* 2C:21–4(a) in that he improperly affixed his jurat to three affidavits prepared for clients when these persons had not personally appeared before him. The facts are as follows:

Respondent had represented a number of Yugoslavian nationals who had been recommended to him by Sebrit Sulejmani, a Yugoslavian who owned numerous apartments in Paterson and rented them to fellow countrymen. Many of these clients spoke little or no English. Sulejmani was their interpreter and spokesman. He would accompany them to respondent's office and interpret for them respondent's explanations of anticipated and pending legal actions.

As respondent's law practice grew and his courtroom obligations increased, he began to rely more and more upon Sulejmani to contact these Yugoslavian clients. Many did not have telephones and would not respond to letters. On occasion,

respondent would have Sulejmani deliver legal correspondence to them and have them answer the questions or sign forms necessary for the legal action.

In October, 1980 respondent requested Sulejmani to assist in contacting Mazar Dauti, one of respondent's Yugoslavian clients, to obtain Dauti's signature on an affidavit. The affidavit stated that Dauti did not own an automobile and was entitled to no-fault benefits from the operator of a motor vehicle which had injured Dauti in an accident. Sulejmani returned the affidavit bearing Dauti's signature to respondent. However, it was not notarized. Respondent affixed his jurat as witnessing Dauti's signature. He then submitted the affidavit to an insurance company to obtain no-fault benefits for Dauti. Respondent engaged in similar conduct in two other instances: in April 1981 with client Husni Marovic and in January 1982 with client Shebrit Doko.

Respondent and two others were later indicted by a Passaic County grand jury. On November 15, 1985 respondent pleaded guilty to three counts of that indictment which charged him with the fourth degree crime of falsifying records, contrary to *N.J.S.A.* 2C:21–4a. The language of the indictment to which respondent specifically pleaded states in relevant part:

### TWENTY–SEVENTH COUNT

... that Steven S. Friedman ..., knowing that he had no privilege to do so falsified an affidavit, ... in that the said Steven S. Friedman with the purpose to deceive ... signed his name as an Attorney at Law to said affidavit thereby *falsely attesting to the fact that* on October 14, 1980, *Mazar Dauti personally appeared before him and signed said affidavit,* contrary to the provisions of N.J.S. 2C:21–4(a)....

### THIRTY SIXTH COUNT

... that Steven S. Friedman on the 20th of April 1981, ... knowing that he had no privilege to do so falsified an affidavit, ... by *falsely attesting to the fact that Husni Merovic appeared before the said Steven S. Friedman* on the above date and *executed said affidavit,* all done with the purpose of deceiving [an insurance company] contrary to the provisions of N.J.S. 2C:21–4(a)....

## FORTY–FOURTH COUNT

... that Steven S. Friedman on the 13th day of January 1982, ... knowing that he had no privilege to do so falsified an affidavit, ... by *falsely attesting to the fact that the said Shebrit Doko personally appeared before the said Steven S. Friedman* on the above date *and executed said affidavit,* all done with the purpose of deceiving [an insurance company], contrary to the provisions of N.J.S. 2C:21–4(a).... [emphasis added]

As part of the plea agreement, the State recommended a noncustodial sentence and dismissal of the 15 remaining counts against respondent. Respondent agreed he would testify for the State, if requested. Respondent acknowledged before the court he had concealed from the insurance company his failure to witness the signature of his clients on the affidavits. Respondent further stated:

I must emphasize that in all three instances, I believed each of my three clients was injured in an automobile accident; I believed each was entitled to no-fault benefits; and I believed each had placed his signature upon the affidavits submitted. The wrongdoing which I now recognize as violating the law involved my improper notarization of affidavits outside of my clients' presence [1T12–11 to 18].[1]

On February 21, 1986 respondent was sentenced. He was placed on two years probation, ordered to perform 200 hours of community service and fined $7,500.

Respondent was temporarily suspended from the practice of law on February 13, 1986. The Office of Attorney Ethics now requests this Board to recommend that respondent be disciplined for his misconduct.

## CONCLUSION AND RECOMMENDATION

A judgment of conviction is conclusive evidence of respondent's guilt. *R.* 1:20–6(b)(1). There is no need to make an independent examination of underlying facts to ascertain guilt. *In re Bricker,* 90 *N.J.* 6, 10 (1982). The extent of final discipline to be imposed is the only issue to be determined. *R.* 1:20–6(b)(2)(ii); *Matter of Kushner,* 101 *N.J.* 397, 400 (1986); *In*

---

[1] 1T refers to the plea transcript of November 15, 1985.

re *Infinito,* 94 *N.J.* 50, 56 (1983). Respondent's conviction establishes that he had engaged in criminal conduct that adversely reflected on his fitness to practice law, and which involved misrepresentation. *DR* 1-102(A)(3) and (4).

In determining the proper discipline to be imposed on an attorney guilty of misconduct, many factors have to be considered. These include the nature and severity of the crime, whether the crime was related to the practice of law, and any mitigating factors, such as evidence of the attorney's otherwise good reputation, prior trustworthy professional conduct, and general good character. There is no rule that requires a certain penalty for conviction of a certain crime. Every disciplinary matter is factually different and must be judged on its own merits. *Matter of Kushner, supra,* 101 *N.J.* at 400-401; *In re Infinito, supra,* 96 *N.J.* at 57.

Respondent has been a member of the bar of this state since 1970. He has no prior disciplinary history and has cooperated fully with the ethics proceedings. *In re Rosenthal,* 90 *N.J.* 12, 17 (1982). There is no indication in the record of a direct illegal pecuniary gain to respondent. When respondent appeared before this Board, he stated he believed the cases involved legitimate accidents which had been reported to the police. He further stated the cases involved actual clients whom he had at one point seen but later was not able to contact. In recommending respondent be suspended from the practice of law, the Office of Attorney Ethics stated:

> Even interpreting this case in a manner most favorable to respondent, it is clear that he knowingly and wilfully took shortcuts in several cases, in the process sacrificing his own integrity and the public image of his chosen profession by assisting, albeit unwittingly, in the intended hoodwinking of an insurance carrier [PB4].[2]

This record does not establish by clear and convincing evidence that respondent was knowingly part of a scheme with

---

[2]PB refers to the brief of the petitioner, the Office of Attorney Ethics, in support of its Motion for Final Discipline based upon a criminal conviction.

others to defraud insurance companies. Neither does it establish that respondent knowingly permitted false information to be supplied to these insurance companies in an attempt to obtain money from them. This record only establishes that he took jurats for three clients although he had not personally witnessed the clients signing the documents. The incidents occurred in October 1980, April 1981 and January 1982.

There are many cases which deal with instances of false swearing by attorneys. In *In re Rospond*, 87 *N.J.* 572 (1981), an attorney who admitted lying to a state grand jury in the course of an investigation of his business partner was suspended for two years. In *In re Schleimer*, 78 *N.J.* 317 (1978), an attorney who falsely testified at a deposition was suspended for one year. In *Matter of Kushner, supra*, 101 *N.J.* 397 (1986), an attorney knowingly filed a false certification with a court to avoid liability on a promissory note he had signed. He was suspended from the practice of law for three years. In *In re Silverman*, 80 *N.J.* 489 (1979), an attorney who knowingly filed a false answer on behalf of a client with the bankruptcy court was suspended for 18 months.

An attorney's professional responsibility in witnessing affidavits is a solemn one. That respondent believed the content of the affidavits to be true and the signatures genuine

> ... does not minimize the effect of the falsity. Courts act on the basis of affidavits and the solemnity of the oath is a substantial factor in assuring the verity of materials therein [*In re DeLucia and Terkowitz*, 76 *N.J.* 329, 338 (1978)].

The execution of jurats and the taking of acknowledgments must be met in all respects. *In re Surgent*, 79 *N.J.* 529, 532 (1979). Five steps are involved in notarizing documents. They are:

(1) the personal appearance by the party before the attorney;

(2) the identification of the party;

(3) the assurance by the party signing that he is aware of the contents of the documents;

(4) the administration of the oath or acknowledgment by the attorney; and

(5) execution of the jurat or certificate of acknowledgment by the attorney in presence of the party [*Jurats and Acknowledgments*, Disciplinary Review Board Notice to the Bar, 112 *N.J.L.J.* 30 (July 14, 1983)].

In *In re Surgent, supra*, 79 *N.J.* 529, the attorney took the jurat for clients who had signed the documents even though the attorney had not actually seen them affix their signatures and had not either obtained their acknowledgment of those signatures or placed them under oath. This attorney also had represented a buyer of real estate without revealing to the buyer the full extent of his own potential profits from the transaction and possible dangers in the transaction to the buyer. He also had acted as an attorney for a corporation in the same area of law as he later acted against the corporation. The Court in that case noted that not one of these instances of misconduct would, standing alone, call for more than a reprimand but taken together they warranted a six month suspension.

In some cases, respondents have been publicly reprimanded for improper execution of a jurat. In *In re Coughlin*, 91 *N.J.* 374 (1982), the attorney executed his jurat on an affidavit of consideration or exemption for a deed as well as upon an acknowledgment on the deed outside of the grantor's presence. In *In re Spagnoli*, 89 *N.J.* 128 (1982), the attorney prepared and filed affidavits to which he signed the name of his client and signed his own name as witnessing his client's signature. In *In re Rinaldo*, 86 *N.J.* 640 (1981), the attorney permitted his secretaries to sign two affidavits and a certification. In *In re Conti*, 75 *N.J.* 114 (1977), the attorney directed his secretary to sign his clients' names to a deed and then signed his name as having witnessed those signatures. In that case his clients could not appear to execute the deed due to health, financial and commuting difficulties.

In all the improper jurat cases, however, the attorney's misfeasance represented an aberational act done for the benefit of a particular client and did not present, as here, a continued pattern of practice.

A review of the cases on point lead to a conclusion that when an attorney committed an act of false swearing wherein he obtained personal gain, the discipline imposed was substantial. Ethical misconduct which involves "the commission of crimes that directly poison the well of justice ... is deserving of severe sanctions and would ordinarily require disbarment." *In re Verdiramo*, 96 *N.J.* 183, 186 (1984). In that case, the Court noted that in the past there had not been uniformity of sanctions for serious acts of misconduct that directly impact on the administration of justice. However, the mandate of *Verdiramo* was not to apply retroactively. See *Matter of Kushner, supra,* 101 *N.J.* at 402. The misconduct involved in the case at hand antedates the *Verdiramo* decision.

In mitigation, the Board considered respondent's unblemished ethical history since becoming a member of the legal profession more than 16 years ago and his reputation in the community and among his peers. The Board also considered that he had not purposely or knowingly sought to injure a client or others. However, the Board concludes that these mitigating factors do not outweigh the aggravating factor of the criminal misconduct involved here. Respondent, an experienced attorney of many years, continued a course of conduct he should have known was improper. The record reflects a developing pattern which undoubtedly would have continued but for the criminal prosecution. An attorney must know that no improper "shortcuts" which impact on the administration of justice will be tolerated.

The majority of the Board therefore concludes that the total pattern of respondent's conduct goes beyond the imposition of a public reprimand. This case is most closely analogous to *In re Silverman, supra,* 80 *N.J.* 489. However, here it was not proved that by clear and convincing evidence respondent knew either that the content of the affidavits was false or that his clients did not actually sign same. Respondent has been temporarily suspended for more than one year which suspension will continue through the completion of the disciplinary

process. Under the totality of the circumstances, the majority recommends that respondent's temporary suspension be deemed sufficient discipline for these offenses.

One member dissented and recommends a two year suspension retroactive to the date of temporary suspension, being of the view that respondent's conduct warrants severe discipline.

The Board further recommends that respondent be required to reimburse the Ethics Financial Committee for appropriate administrative costs.

## CONCURRENCE

I concur with the findings, conclusions and recommendations of the Board concerning this respondent's conduct under the particular facts and procedural posture of this case. The independent examination and evaluation of the entire record required of the Board is limited to the facts underlying respondent's convictions. It cannot and does not include consideration of unproven allegations. *In re Gross*, 67 *N.J.* 419, 424 (1975); *R.* 1:20-6(b)(2)(ii). Absent the criminal convictions and the totality of the circumstances surrounding respondent's behavior, I would have recommended a public reprimand.

/s/Waldron Kraemer
Waldron Kraemer, Esq.
Date: <u>March 7, 1987</u>

## CONCURRENCE

I reluctantly concur with the findings, conclusions and recommendations of the Board. This matter comes before the Board pursuant to R. 1:20-6(b) as a Motion for Final Discipline Based Upon Criminal Conviction. The rule mandates that in such applications the sole issue to be determined shall be the extent of final discipline to be imposed.

Pursuant to R. 1:20-6(b)(2), the Director of the Office of Attorney Ethics is accorded exclusive jurisdiction to investigate and prosecute all matters where an attorney is a defendant in a

criminal proceeding. Subpart (i) of this rule specifies that at the conclusion of all criminal matters resulting in conviction, "... the Director *may* file directly with the Board and serve upon the respondent or counsel ... a Motion for Final Discipline Based Upon a Criminal Conviction." (emphasis added). Discretion is accorded to the Director in this regard. What this rule imports is that the Director need not proceed in this fashion but might, should he so elect, alternatively proceed by filing an ethics complaint in the ordinary course.

During the hearing in this matter before this Board, counsel for the Office of Attorney Ethics responded that it would be in the Board's discretion to direct further hearing or investigation,[1] but that in this particular matter substantial reasons existed why pursuing such a course was not practical (Disciplinary Review Board Hearing, July 16, 1986, p. 5). In large measure, reliance was placed upon the decision made by the County Prosecutor's office in accepting the plea agreement (Disciplinary Review Board Hearing, July 16, 1986, p. 25–6).

The underlying facts of this case present very serious allegations. The respondent pled to but three of many counts alleged. I concur with the Board and with Board Member Kraemer's concurrence that the Board may not act on and consider unproven allegations. My willingness to concur with the Board's opinion is based upon my understanding of what is now properly before the Board, as well as upon the understandable and proper decision of the Office of Attorney Ethics in exercising its discretion not to pursue the other serious allegations encompassed in the remaining counts of indictment.

Nonetheless, I find it appropriate to here underscore the discretionary nature of the Director's decision whether, following a criminal conviction, a motion of this sort should be brought. The exigencies and practicalities of criminal practice

---

[1]Rule 1:20–6(b)(2)(ii) would appear, however, to limit this Board's power to remand to remands dealing solely with mitigation.

do not always directly parallel the strictures of the Rules of Professional Conduct. Indeed, even an acquittal in a criminal proceeding against an attorney is not *res judicata* and does not preclude a subsequent disciplinary proceeding based on the same charge or conduct. *In re Callahan,* 70 *N.J.* 178, 184 (1976); *In re Hyett,* 61 *N.J.* 518, 521 (1972); *In re Friedland,* 59 *N.J.* 209 (1971); *In re Pennica,* 36 *N.J.* 401, 418 (1962).

Clearly, the prosecutor's decision in the criminal context to dismiss certain counts of an indictment in favor of a plea should not always mandate a like decision by the Office of Attorney Ethics. That Office and its Director should view each case as an individual entity and base its decision upon the facts and circumstances of each individual case.

/s/ Lee M. Hymerling

Lee M. Hymerling, Esq.

Date: March 6, 1987