IN THE MATTER OF JOHN S. POWER, AN
ATTORNEY AT LAW.

April 12, 1989.

## ORDER

The Disciplinary Review Board having recommended to the Court that JOHN S. POWER of BRIELLE, who was admitted to the bar in 1966, be suspended from the practice of law for three years for his violation of *DR* 1–102(A)(1), (3), (5), and (6), which arose out of his plea of guilty to obstructing the administration of law (*N.J.S.A.* 2C:29–1);

And respondent, by his attorney, having informed the Court that he is not contesting the imposition of the recommended sanction;

And good cause appearing;

It is ORDERED that the report of the Disciplinary Review Board is adopted, and JOHN S. POWER is suspended from the practice of law for three years and until the further Order of the Court, effective May 1, 1989; and it is further

ORDERED that respondent be restrained and enjoined from practicing law during the period of his suspension and that he comply with Administrative Guideline No. 23 of the Office of Attorney Ethics dealing with suspended attorneys; and it is further

ORDERED that respondent reimburse the Ethics Financial Committee for appropriate administrative costs.

## APPENDIX

### *Decision and Recommendation of the Disciplinary Review Board*

To the Honorable Chief Justice and Associate Justices of the Supreme Court of New Jersey.

This matter is before the Board on a Motion for Final Discipline Based Upon a Criminal Conviction filed by the Office of Attorney Ethics ("OAE"). *R.* 1:20–6(b)(2)(i). Respondent pleaded guilty to the disorderly persons offense of obstructing the law, in contravention of *N.J.S.A.* 2C:29–1.

Respondent was admitted to the New Jersey bar in 1966. In January 1984, a Monmouth County Grand Jury filed a 101–count indictment against respondent and 18 co-defendants in connection with a conspiracy to commit numerous criminal acts. Respondent was charged in nine counts (counts 1, 2, 3, 7, 8, 9, 17, 90, and 101) [1]. Those counts involved: (a) conspiracy to commit crimes of the second, third and fourth degrees, as follows: theft, arson, falsification of records, cruelty to animals, perjury, false swearing, criminal mischief, hindering apprehension or prosecution, terroristic threats, criminal coercion, witness tampering, fabrication of evidence, compounding race-fixing, and rigging publicly exhibited contest (count one); (b) conspiracy to commit the crimes of racketeering involving the use of firearms and the use of violence (count two); (c) racketeering activity involving crimes of violence and the use of firearms (count three); (d) forgery of two Smith–Barney Harris Upham Company Insurance Brokerage checks in the amount of $5,634.20 and $4,600.41 (counts seven and eight); (e) theft of $10,234.61 paid by Smith–Barney as proceeds from a margin account opened on the basis of stolen ATT stock certificates (count nine); (f) theft of insurance proceeds in the amount of $22,000.00 by drawing trust account checks falsely indicating that the funds related to the purchase of a horse (count 17); and (g) tampering with witnesses (counts 90 and 101).

The main target of the indictment, Daniel Chansky ("Chansky"), a licensed groom and horse trainer, had been respondent's client for many years. The indictment charged, among other things, that Chansky, respondent, and others were in-

---

[1]The indictment is attached to the OAE brief as Exhibit A.

volved in a complex insurance scheme centering on the destruction of motor vehicles and the killing of nine thoroughbred racehorses. More specifically, the indictment charged that Chansky, single-handedly or with others, hid or destroyed motor vehicles and boats in order to illegally collect insurance proceeds. It charged, also, that Chansky was involved in a scheme in connection with fictitious sales of thoroughbred horses. Chansky would "sell" horses to a buyer who, in turn, would write him a check—ordinarily covered by cash provided by Chansky—bearing an inflated sales price in order to obtain high insurance coverage for the horses. Shortly after the insurance was obtained, the horses died of alleged accidental or natural causes. As stated in the indictment, Chansky, alone or aided by others, killed nine racehorses by either placing a plastic sealed bag over the horse's head, thus causing suffocation; or by breaking the horse's neck and wedging it under the side of the barn; or by shooting the horse's heart with a bow and arrow, removing the arrow and then shoving a rake handle in the wound. Pursuant to the indictment, the foregoing violent acts were intended to give the appearance that the horses' deaths had been accidental or natural so Chansky could collect the insurance proceeds obtained on the basis of the inflated values.

On April 26, 1985, Chansky was sentenced on 29 counts of the indictment to 24 years in the New Jersey State Prison with a ten-year parole ineligibility stipulation.

The day before, April 25, 1985, pursuant to a plea agreement, respondent entered a plea of guilty to the disorderly persons offense of obstructing the administration of law, in violation of *N.J.S.A.* 2C:29–1. In exchange for his guilty plea, the prosecutor's office recommended dismissal of the nine counts brought against respondent in the indictment.

At the plea hearing, respondent admitted he purposely advised a client not to disclose any information to law enforcement authorities concerning a stock fraud investigation. He

advocated the cover-up not for the client's protection, but because of his fear that he was also a target in the investigation (T11-6 to 25, T12-1 to 4).[2] He further admitted that he aided Chansky in filing a false claim with an insurance company in connection with alleged fire damage to a tractor trailer owned by Chansky, despite harboring a reasonable suspicion, based upon Chansky's recitation of the facts, that the claim was fraudulent (T8-6 to 18). Moreover, respondent admitted he forwarded false information to an insurance company regarding the inflated value of one of the dead horses, $22,500.00, in spite of access to extrinsic evidence reflecting a substantially lesser value.[3]

On June 18, 1985, respondent was ordered to pay a $1,000.00 fine and a $25.00 penalty to the Violent Crimes Compensation Board.

On January 22, 1988, the OAE filed a Notice of Motion for Final Discipline based upon respondent's conviction.

## CONCLUSION AND RECOMMENDATION

A criminal conviction is conclusive evidence of respondent's guilt in disciplinary proceedings. *Matter of Goldberg,* 105 *N.J.* 278, 280 (1987); *Matter of Tuso,* 104 *N.J.* 59, 61 (1986); *In re Rosen,* 88 *N.J.* 1, 3 (1981); *R.* 1:20-6(b)(1). No independent examination of the underlying facts is, therefore, necessary to ascertain guilt. *In re Bricker,* 90 *N.J.* 6, 10 (1982). The only issue to be determined is the quantum of discipline to be imposed. *Matter of Goldberg, supra,* 105 *N.J.* at 280; *Matter of Kaufman,* 104 *N.J.* 509, 510 (1986); *Matter of Kushner,* 101 *N.J.* 397, 400 (1986); *In re Addonizio,* 95 *N.J.* 121, 123-124 (1984); *In re Infinito,* 94 *N.J.* 50, 56 (1983); *In re Rosen,*

---

[2]T denotes the transcript of respondent's guilty plea on April 25, 1985.

[3]Chansky initially demanded $22,500.00. Ultimately, the matter was settled for $5,000.00.

*supra*, 88 *N.J.* at 3; *In re Mirabelli*, 79 *N.J.* 597, 602 (1979); *In re Mischlich*, 60 *N.J.* 590, 593 (1977).

Respondent's conviction established that he engaged in criminal conduct which was prejudicial to the administration of justice and which adversely reflected on his fitness to practice law, in violation of *DR* 1–102(A)(1), (3), (5) and (6). In examining the underlying facts, the Board finds the relationship which gave rise to the offenses arose directly from a lawyer-client relationship and the offenses were related to the practice of law. By obstructing the administration of law, respondent committed a "serious crime", as defined by *R.* 1:20–6(a)(2). As the Court noted in *Matter of DiBiasi*, 102 *N.J.* 152 (1986):

Although the definition (of "serious crimes") is contained in a provision dealing with automatic temporary suspension of attorneys convicted of crimes, it reflects our belief that crimes of dishonesty touch upon a central trait of character. [*Matter of DiBiasi, supra,* 102 *N.J.* at 154]

The Court noted further that "when a crime of dishonesty touches upon the administration of justice, the offense is deserving of severe sanctions and would ordinarily require disbarment." *Matter of DiBiasi, supra,* 102 *N.J.* at 155, citing *In re Verdiramo,* 96 *N.J.* 183, 186 (1984).

In *Matter of Kushner,* 101 *N.J.* 397 (1986), the Court suspended for three years an attorney who pleaded guilty to one count of false swearing. In that case, the attorney falsely stated, in his answer to a civil suit complaint and in a sworn certification filed with the court, that the signature on a $40,000 promissory was not his but, rather, the product of forgery. In mitigation, the Court took into account respondent's unblemished professional record in 23 years of practice, his good character and fine reputation as an active trial attorney and the absence of harm to any client.

In *In re Silverman,* 80 *N.J.* 489 (1979), an attorney pleaded guilty to one count of obstruction of justice for having filed an answer in a bankruptcy matter falsely stating that his client had a lawful right to maintain custody of approximately 26 tractors and trailers belonging to the bankrupt firm. The

Court took into consideration several mitigating factors in determining the extent of the discipline to be imposed. Respondent had been a member of the bar for 50 years, with an unblemished record and an excellent reputation; he had fully cooperated with the ethics proceedings, frankly admitting his guilt and showing contrition; and no litigant or other person had suffered any loss. Accordingly, the Court viewed respondent's single act of misrepresentation as an aberration unlikely to be repeated and imposed an 18–month suspension from the practice of law.

A one-year suspension was imposed in *In re Labendz*, 95 *N.J.* 273 (1984), when an attorney submitted a loan application to secure a mortgage for a client, falsely listing a purchase price higher than the contract price. In that case, respondent had not been charged with the commission of a crime, as here. In imposing a one-year suspension, the Court considered respondent's previously unblemished record of 14 years, his excellent reputation, the absence of loss to the client or of substantial personal gain to respondent, and the fact that the misrepresentation stemmed from one single incident.

In *Matter of Friedman*, 106 *N.J.* 1 (1987), an attorney pleaded guilty to three counts of falsifying records by improperly affixing his jurat to three affidavits prepared for clients who had not personally appeared before him. The Court concluded that

> [t]his record does not establish by clear and convincing evidence that respondent was knowingly part of a scheme with others to defraud insurance companies. Neither does it establish that respondent knowingly permitted false information to be supplied to these insurance companies in an attempt to obtain money from them. [*Matter of Friedman, supra,* 106 *N.J.* at 7]

In suspending respondent from the practice of law for more than one year, the Court considered, in mitigation, respondent's unblemished record of 17 years, his full cooperation with the ethics proceedings, the absence of pecuniary gain by respondent, his lack of knowledge that the contents of the affidavits were false, his lack of knowledge that his clients had not

actually signed the affidavits, and his lack of intent or purpose to injure his clients or others.

In *In re Verdiramo*, 96 *N.J.* 183 (1984), the Court suspended an attorney for the period that he had been barred from the active practice of law since his temporary suspension (seven years). In that case, the attorney had pleaded guilty to a charge of obstructing the administration of justice by attempting to influence a witness scheduled to testify before a grand jury. The attorney knew he was asking the witness to perjure himself to protect a client of the attorney. The Court concluded that the special circumstances present in that case—the attorney's removal from the practice of law for seven years and the passage of eight years since the criminal conduct—warranted a suspension, rather than disbarment.

In *In re Bricker*, 90 *N.J.* 6 (1982), however, the Court disbarred an attorney who had been found guilty by a jury of conspiracy to obstruct justice, of using a corporation to commit fraud, and of two instances of false swearing. The Court noted respondent had engaged in repeated acts of false swearing, fraud and deception; that his deceit and dishonesty had not been an aberrational act arising out of mitigating pressures but, rather, a carefully chartered course of conduct extending over a period of years "during which he had to think about what he was doing"; and that his motivation had been greed, unchecked by conscience or integrity. *In re Bricker, supra*, 90 *N.J.* at 10.

Respondent's conviction of obstruction of the administration of law brings disrepute to the entire legal profession. It runs counter to the standard of morality and ethics required of an attorney. Disciplinary proceedings, however, seek not to punish the attorney, but to protect the public against the attorney who cannot or will not measure up to the high standards of responsibility required of every member of the profession. *In re Getchius*, 88 *N.J.* 269, 276 (1982), citing *In re Stout*, 75 *N.J.* 321, 325 (1978). "The severity of the discipline to be imposed

must comport with the seriousness of the ethical infraction in light of all the relevant circumstances." *In re Nigohosian,* 88 *N.J.* 308, 315 (1982). Mitigating factors are, therefore, relevant and may be considered. *In re Hughes,* 90 *N.J.* 32, 36 (1982).

The record here cannot support, by clear and convincing evidence, that respondent had actual knowledge of the falsity of the information submitted to the insurance company. As respondent admitted to the court at the time of his guilty plea, based upon his

knowledge of Mr. Chansky and his—the various representations (respondent) had with him in the past and the various facts that he submitted to (respondent) regarding (the truck) transaction [T8–15 to 18],

a reasonable suspicion was formed in respondent's mind that it was a fraudulent claim. Respondent admitted, also, that he had a reasonable suspicion that the value of the dead horse had been inflated. As he testified at his guilty plea proceeding,

[W]hen I was requested, by the insurance company to forward various information to them regarding the value of the horse and why it should be worth that amount of money, and initially he advised me of certain circumstances of how he had purchased the horse, and I forwarded that information to the insurance company.

I was then provided with documentation such as a certificate of eligibility form, which gave the background of the horse, and on looking at that certificate and based on the information he had given me, I formed the assumption, formed reasonable suspicion that the value had been inflated. (T10–13 to 25).

The record is clear that, although respondent had reason to suspect certain information submitted to the insurance company was false, he lacked actual knowledge of its falsity. Additionally, respondent's acts were not motivated by any demonstrated personal gain. Moreover, respondent's misconduct predated the *Verdiramo* admonition that the commission of crimes which directly poison the well of justice ordinarily will require disbarment. *In re Verdiramo, supra,* 96 *N.J.* at 186.

Respondent's grave misconduct, however, goes to the heart of the administration of justice, projecting an image of corruption of the judicial process. Furthermore, in 1977 respondent was suspended from the practice of law for three months for transferring a $10,000.00 escrowed fund to his trust account,

without the client's knowledge or consent, then drawing approximately $11,000.00 against the account, thereby leaving it short by approximately $1,000.00. Additionally, he falsely testified at a deposition that the $10,000.00 sum was still in his trust account. The Court found respondent (1) had violated his fiduciary obligation with respect to an escrow account; (2) had given false testimony in reference thereto in a lawsuit; and (3) had improperly invaded clients' funds in his trust account for the benefit of another client. *In re Power*, 72 *N.J.* 452 (1977). Two years later, in June 1979, respondent disbursed to a client a $955.00 deposit in a real estate transaction, six days after the buyers, who were unrepresented by counsel, requested the return of the deposit monies as a result of the parties' failure to reach an agreement. The Court concluded respondent had disbursed the funds without the prospective buyers' authorization and, furthermore, in the face of an express prohibition thereto. Although the Court regarded respondent as "hovering on the brink of suspension," the Court considered several mitigating factors and imposed only a public reprimand, at the same time warning respondent that

[t]he indulgence represented by that discipline will not be forthcoming should respondent again run afoul of the Disciplinary Rules. *In re Power*, 91 *N.J.* 408, 410 (1982).

Moreover, during the pendency of the foregoing ethics proceeding, but prior to the 1982 decision by the Supreme Court, respondent engaged in the misconduct which is the subject matter here. Indeed, the criminal complaint at hand, charging respondent with violation of *N.J.S.A.* 2C:29–1, states the underlying criminal conduct occurred between January 1981 and January 1984. The last ethics hearing of the 1982 *Power* matter took place in June 1981.

Several years have elapsed, however, since the criminal conduct occurred. Respondent's guilty plea was entered more than three years ago. Consequently, when balancing in 1988 the import of respondent's serious misconduct and his prior ethical history, against the passage of time, the Board recom-

mends respondent be suspended from the practice of law for a period of three years. One member did not participate.

The Board further recommends respondent be required to reimburse the Ethics Financial Committee for appropriate administrative costs.