777 A.2d 891

IN THE MATTER OF REGISTRANT J.G.

Argued January 30, 2001—Decided July 17, 2001.

*Craig J. Hubert* and *James M. Graziano* argued the cause for appellant, J.G. (*Brotman, Graziano* and *Hubert* and *Wolff & Samson,* attorneys; *Mr. Hubert, Mr. Graziano* and *John M. Simon,* on the briefs).

*Jessica S. Oppenheim,* Deputy Attorney General, argued the cause for respondent, State of New Jersey (*John J. Farmer, Jr.,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

STEIN, J.

This appeal concerns the application of the Registration and Community Notification Law, *N.J.S.A.* 2C:7–1 to –5 (Registration Law) and *N.J.S.A.* 2C:7–6 to –11 (Community Notification Law), collectively known as Megan's Law, to a juvenile who pled guilty in 1996 to conduct that, if committed by an adult, would constitute the crime of second-degree sexual assault in violation of *N.J.S.A.* 2C:14–2c(1). The juvenile was ten years old when the incident occurred, and the victim was the juvenile's eight-year-old female cousin. In June 1999 the Law Division classified J.G. as a Tier 2 offender and ordered notification of various elementary and middle schools in the vicinity of J.G.'s residence. The Appellate Division affirmed the Tier 2 classification, but limited notification only to the specific school that J.G. is or will be attending. We granted J.G.'s Petition for Certification, 165 *N.J.* 602, 762 *A.*2d 217

(2000), challenging J.G.'s classification, the application of Megan's Law to J.G., and the constitutionality of Megan's Law as applied to J.G.

I

The relevant facts are substantially undisputed. In October 1995 two juvenile delinquency complaints were filed against J.G., charging him on two counts with conduct that if committed by an adult would constitute first-degree aggravated sexual assault based on the commission of acts of sexual penetration with two victims under the age of thirteen. See *N.J.S.A.* 2C:14–2a(1). The conduct allegedly occurred on September 13, 1995 when J.G. was ten years old. One of the alleged victims was P.D., J.G.'s eight-year-old cousin, and the other was B.G., his five-year-old sister.

In May 1996, J.G. appeared before the Chancery Division, Family Part, in connection with a negotiated plea proceeding involving those charges. The Assistant Prosecutor informed the court that the charge involving J.G.'s sister was to be dismissed, and that the charge involving J.G.'s cousin would be amended to allege conduct that, if committed by an adult, would constitute second-degree sexual assault in violation of *N.J.S.A.* 2C:14–2c(1), which provides: "An actor is guilty of sexual assault if he commits an act of sexual penetration with another person under any one of the following circumstances: (1) The actor uses physical force or coercion, but the victim does not sustain severe personal injury."

The hearing transcript discloses that the state recommended the imposition of a suspended sentence subject to two conditions: first, that J.G. continue attendance and treatment at a counseling program known as Family Growth; and second, that he not be permitted to babysit for or be left alone with any young children. The Public Defender represented to the court that J.G., who was present with his mother, was prepared to accept the State's plea offer. The Public Defender then conducted an interrogation of J.G. to establish a factual basis for the plea that in its entirety consisted of the following testimony:

Q. J.G. . . . it indicates that on September 13, 1995, you engaged in sexual conduct or sexual assault with a P.D. I'm not going to tell you her name but you know who P.D. is, correct?

A. Yes.

Q. And on this particular day, do you remember the incident? Do you remember what happened?

A. Yes.

Q. And is it true that on that day, you and P.D. did engage in sexual behavior?

A. Yes.

Q. And you had P.D. clothes taken off?

A. Yes.

Q. And you had your clothes taken off?

A. Yes.

Q. And you rubbed yourself up against P.D.?

A. Yes.

Q. And you also tried to insert your privates into P.D.'s privates, correct?

A. Yes.

Q. And P.D. was less than 13 years of age at the time, right?

A. Yes.

Q. Okay. At the time this occurred, did you know what you were doing?

A. Yes.

Q. And did you know what you were doing was wrong?

A. Yes.

The Deputy Public Defender then asked the following questions of J.G.:

Q. J.G., at the time you indicated that you did try to penetrate P.D., correct?

A. Yeah.

Q. And you did—although you didn't actually get full penetration, there was some penetration, correct?

A. Yes.

THE COURT: And there was no severe personal injury?

MR. BAULDOCK: None, Judge.

THE COURT: Okay. It was you that was trying to do this, right, J.G.?

J.G.: Yes.

The court then asked the following questions:

Q. Do you understand, J.G., that by admitting to a charge of this type, a sex assault offense, that there's a law in New Jersey and many other states now that says that you would have to register as a sex offender anywhere that you live in this state with the local police department. Do you know that?

A. No, not really.

Q. Okay.

A. Or, yes.

Q. All right. You do know that? You had a chance to talk to Mr. Bauldock about that?

A. Yes.

Q. Okay. And there's another part of that law that says that that status as a sex offender be communicated more widely than just with the police department. It could let the community know also. That depends on a lot of things though. It depends on how seriously involved they felt that you are, how serious the offense was, how many offenses of this nature. I think that your age, you know, probably also is one of the factors looked into. I just want you to know that that possibility exists and do you know that?

A. Yes.

Q. Okay. And knowing that, you wish to stand by your plea here today, your admission to this charge?

A. Yes.

In October 1996 J.G. was sentenced, consistent with the plea agreement, to an indeterminate custodial term not to exceed three years but the court suspended the sentence, placing J.G. on probation for two years on condition that he attend and complete the Family Growth counseling program and comply with any aftercare recommendations of Family Growth. The court also requested the Division of Youth and Family Service (DYFS) to consider the possibility of an out-of-home placement for J.G.

In December 1996 the Family Part conducted a sentencing review hearing. The court was informed that J.G. was "doing very well" in the Family Growth program. Although DYFS did not recommend an out-of-state home placement, it referred J.G.'s family to a family counseling program. Because J.G.'s therapy at Family Growth might extend for a longer period than the original two-year probationary term, the court increased the probationary term to three years subject to the same conditions that had been imposed in October. In addition, the court ordered that J.G. not be placed in a caretaker role with younger children and also ordered that there be no unnecessary contact with the victims of the alleged sexual assaults.

Approximately sixteen months after the sentencing review hearing, the Mercer County Prosecutor served J.G. with notice that, pursuant to Megan's Law, he had been classified in Tier 2 as a moderate risk offender, with a Registrant Risk Assessment Scale (RRAS) score of fifty-five. The Attorney General Guidelines for Law Enforcement for the Implementation of Sex Offender Registration and Community Notification Laws (March 2000) (Attorney General Guidelines or Guidelines) state that an RRAS score of 0 to 36 denotes a low risk or Tier 1 offender, a score of 37 to 73 denotes a moderate risk or Tier 2 offender, and a score of 74 or higher denotes a high risk or Tier 3 offender. Based on J.G.'s RRAS score of fifty-five, the Prosecutor sought to notify two local police departments and numerous schools, preschools, and childcare programs including: Busy Bee Nursery Kindergarten, Happy World Day Care Center, Maple Stream Road Pre School, Roger's Elementary School, East Windsor Alternative Program, Hightstown High School, Kreps Middle School, Back Elementary School, Community Adult High School, C.I.F.A. (Dorchester Drive), C.I.F.A. (Springcrest Road), Eden Institute (Old York Road), Community Options, Inc. (Dutcheneck Road), Cox Pre School, Little Beaver Nursery School, Hightstown East Windsor YMCA Childcare, The Learning Tree, Loving Care Pre School, Better Beginnings Child Development, and Hightstown East Windsor Head Start. J.G., through counsel, filed a timely notice of an objection to the tier classification.

The Law Division conducted an initial Megan's Law conference in May 1998 at which the Assistant Prosecutor informed the court that the issue whether penetration had occurred during the sexual assault of J.G.'s cousin had been "called into question" by defense counsel, and that that issue affected J.G.'s RRAS score. The Assistant Prosecutor specifically referred to a letter from the Director and a staff clinician at the Juvenile Intervention Program operated by Catholic Charities of the Trenton Diocese, of which the Family Growth counseling program was a division, and which stated in part: "Throughout [J.G.'s] assessment period and course of treatment, it has been determined with a recognized degree of

certainty ... that he did not commit an act of penetration as he admitted to the court [at] which he was consequently adjudicated delinquent." The Assistant Prosecutor suggested that the penetration issue be resolved in a post-conviction relief proceeding to be initiated by counsel for J.G., and that in the interim Tier 1 Megan's Law notification would proceed immediately, a proposal that was accepted by both defense counsel and the court.

In October 1998, during a Law Division proceeding in which counsel for J.G. unsuccessfully sought fees and costs relating to an application to compel the Public Defender's office to turn over J.G.'s Family Part files, J.G.'s counsel informed the court that J.G. preferred to proceed to a Megan's Law hearing to establish tier classification rather than challenge J.G.'s plea through a post-conviction relief proceeding. Counsel for J.G. thereafter submitted written requests for a hearing to the Mercer County Prosecutor in December 1998, January 1999, and March 1999, and then moved in April 1999 to compel a hearing or dismiss the Prosecutor's request for Tier 2 notification. In response, the Prosecutor served J.G. with a new Tier 2 classification notice, accompanied by a revised RRAS score of forty-seven and a request for Megan's Law notification limited to the Melvin Kreps Middle School, Hightstown High School, Hightstown Police Department and the East Windsor Police Department. At a hearing in May 1999, the Prosecutor informed the court that the State intended to call no witnesses and would rely on the prior Family Part proceedings and the documents produced in the course of Megan's Law discovery proceedings. The court then referred to a May 26, 1999 letter from the Catholic Charities Juvenile Intervention Program to J.G.'s counsel which stated in part:

> In conclusion, J.G. is an adolescent who pled guilty to a sexual assault approximately four years ago when he was eleven years of age. At that time, he clearly did not have an understanding of what a sexual assault constituted, what was involved in a sexual act, the impact that this type of behavior could have on children, nor was he able to relate, in words, what had occurred between he and his victims. It has also been determined, with a recognized degree of certainty within my field of counseling, that he did not commit an act of penetration as he admitted to in court and to which he was subsequently adjudicated. J.G. has demonstrated significant

improvement over the past three years in treatment despite his learning problems. He has been motivated to change and his family has supported him in the process.

Taking into account the clinical evaluation, his progress in treatment and the results of the three risk assessment scales, J.G. appears to be a low risk of re-offending within the community at this point in time. There seems to be no need to notify schools in the area to protect the community.

The court requested that J.G.'s counsel produce one of the two signatories to that Catholic Charities' letter at the next hearing.

At a hearing in June 1999, Linda Pangalos, J.G.'s treating therapist and the assistant program director of the Catholic Charities' Family Growth program testified on J.G.'s behalf. Pangalos, the founder of the Catholic Charities' Family Growth Program in 1992, had worked as a counselor with sexually abused and sexually aggressive children since 1979. She testified that she previously has provided evaluations of juvenile sex offenders to the Mercer County Prosecutor's Office and performs a majority of the juvenile evaluations required by the Family Part of the Mercer County Chancery Division.

Ms. Pangalos testified that she began treating J.G. in September 1995, using individual, family, and group counseling sessions. She soon terminated the group counseling sessions because J.G. lacked the necessary communication skills, noting that his primary language is Spanish, that school child-study teams had classified him as multiple-handicapped and perceptually impaired, that he lacked the basic ability to read and spell simple words and had difficulty reasoning on an abstract level. She testified that J.G. has been participating in counseling for about three years and nine months, that his attendance has been fairly good and that he has been extremely cooperative in his participation. She noted that although she has seen J.G. weekly since September 1995, she had not been contacted by the deputy Public Defender representing J.G. at any time prior to his testifying at the plea hearing in Family Part on May 9, 1996.

She testified that although J.G. had admitted in his plea hearing to an act of penetration, she did not believe he understood the meaning of the word. She testified that J.G. equated rape with

sex, and that he understood sex to mean the act of "rubbing against someone." She testified that his limited ability to speak English impaired his ability to communicate accurately about sexually related conduct. She also stated that J.G., through the use of anatomically correct dolls, had told her that when the incidents occurred involving alleged sexual assaults of his cousin and sister during which he laid down on top of each of them, all of them were wearing underwear.

Ms. Pangalos testified that in her opinion J.G. had not penetrated either his cousin or his sister on the occasion in question. She based her opinion on the September 18, 1995 medical examination of J.G.'s sister that had resulted in a finding of an intact hymen and "no signs of sexual abuse," as well as on her experience and extensive opportunities to interview and interrogate J.G. about those incidents and related maters during the past forty-five months. On cross-examination, Ms. Pangalos was questioned about a statement to the police made by J.G.'s older sister to the effect that when she entered the room J.G.'s cousin was unclothed and J.G. was on top of her with his penis exposed out of his underwear. Mrs. Pangalos responded that based on her impressions J.G.'s version of the event was more reliable because he displayed to her no intent or desire to minimize the extent of his fault or responsibility for what had occurred.

In response to the court's question, Ms. Pangalos testified that because of J.G.'s significant progress through counseling, and his increased awareness of the harm caused to victims by inappropriate sexual behavior, he presented a low risk of reoffense and that Tier 2 notification was unnecessary.

At the next hearing in June 1999, the Court and counsel reviewed the RRAS for J.G., revised as of March 1999, that reflected a score of forty-seven, placing J.G. in the moderate-risk Tier 2 category. At that hearing only three categories on the RRAS were sharply contested by counsel. Under the heading "Seriousness of Offense," counsel for J.G. contested items 1 and 2, "Degree of Force" and "Degree of Contact." Under the heading

"Offense History," counsel for J.G. contested item 5, "Number of Offenses/Victims." On those issues the Assistant Prosecutor referred to police reports included in the Megan's Law discovery file that contained information about other inappropriate sexual conduct committed by J.G. in September 1995, the same month in which the alleged sexual assaults of his cousin and sister occurred. Concerning the item labeled "Degree of Force" on the RRAS, the Assistant Prosecutor referred to an allegation that J.G. approached an elementary school child (N.P.) and "grabbed her wrist and told her that he wanted to have sex with her for twenty dollars." The police report also stated that J.G. threatened to kill the child if she told anyone. The Assistant Prosecutor also referred to a report of an allegation that J.G. approached another elementary school child (T.P.) and "told her to strip and if she did not strip he would kill her." Neither child reported having any physical contact with J.G., and neither of those allegations resulted in the filing of formal charges against J.G. Based on those allegations, the Assistant Prosecutor argued that J.G.'s threats to those two children justified a score of "5" in the "Degree of Force" category on the RRAS. The court rejected that contention, however, concluding that the State had not proved by clear and convincing evidence that the alleged incidents had occurred.

Concerning the item on the RRAS entitled "Number of Offenses/Victims," the State referred to a police report in which it was alleged that approximately one month prior to the other incidents J.G. had exposed himself on two separate occasions to an elementary school child (J.R.) and to a younger child (E.T.), allegations that the Assistant Prosecutor asserted were admitted by J.G. No formal charges were filed regarding either of those allegations. The court concluded that clear and convincing evidence supported the allegation concerning the younger child, and accordingly determined that there had been "three or more victims" for purposes of item 5 on the RRAS, supporting the State's scoring of "9" for that item.

Concerning the issue of penetration of J.G.'s cousin that was material to the scoring of item 2, "Degree of Contact," on the RRAS, counsel for J.G. referred to two separate police reports by the investigating detective contained in the State's Megan's Law discovery file and dated September 14 and September 19, 1995. Referring to J.G.'s sexual encounter with his cousin, the first report stated: "It could not be determined if there was penetration or not." The second report stated: "It is unknown if there was penetration." J.G.'s counsel also relied on the testimony and report of Linda Pangalos who had concluded "with a recognized degree of certainty ... that [J.G.] did not commit an act of penetration as he admitted to in court...." Nevertheless, on the basis of all the evidence in the record, including J.G.'s plea testimony, the police reports, and the Megan's Law discovery materials, the court independently concluded that penetration had been established by clear and convincing evidence. That determination supported a score of "15" for item 2, "Degree of Contact," on the RRAS, resulting in a total RRAS score of 42. The court's earlier finding that threats of force had not been proved by the State resulted in a change in the scoring of item 1, "Degree of Force," from "5" to "0", accounting for the aggregate change in the RRAS score from 47 to 42. A different result on the penetration issue, accordingly, would have reduced the RRAS score to 27, justifying a low-risk Tier 1 classification.

At a final hearing in June 1999, the court accepted the State's contention that based on J.G.'s RRAS score of 42 and his Tier 2 classification, Megan's Law notification should be provided to all elementary, middle, and high schools within a two-mile radius of J.G.'s residence. Accordingly, on June 30, 1999, the Law Division ordered that notification be provided to Melvin Kreps Middle School, Hightstown High School. Hightstown Police Department, East Windsor Police Department, Roger's Elementary School, Black Elementary School, and East Windsor Alternative Program. As noted, the Appellate Division affirmed J.G.'s Tier 2 classification but limited notification only to the school that J.G. presently is attending or, in the future, will attend.

## II

On both statutory and constitutional grounds, J.G. asserts that the registration and notification of Megan's Law should not apply to him because he was only ten years old when the underlying offense occurred. To provide a context for our consideration of the issues before us, we first compare the requirements imposed by Megan's Law with the relevant provisions of the Code of Juvenile Justice, *N.J.S.A.* 2A:4A-21 to -49.

In general, the registration requirements of Megan's Law, *N.J.S.A.* 2C:7-2 to -5, apply to all juveniles adjudicated delinquent for commission of a sex offense as defined in *N.J.S.A.* 2C:7-2b. As the Court observed in *Doe v. Poritz*, 142 *N.J.* 1, 662 *A.*2d 367 (1995):

> Registration requires ... appearance at a local police station for fingerprinting, photographing, and providing information for a registration form that will include a physical description, the offense involved, home address, employment or school address, vehicle used, and license plate number.
>
> [*Id.* at 21, 662 *A.*2d 367.]

Registrants other than those whose conduct was repetitive and compulsive annually must verify their address with the local law enforcement agency, and provide notice of any change of address. *N.J.S.A.* 2C:7-2d to -2e. In the event a registrant relocates to another municipality, re-registration with the local law enforcement agency must occur not less than ten days prior to the change of residence. *N.J.S.A.* 2C:7-2d. We also observed in *Doe, supra*, that

> [a]ll of these are lifetime requirements unless the registrant has been offense-free for fifteen years following conviction or release from a correctional facility (whichever is later) and, on application to terminate these obligations, can persuade the court that he or she is not likely to pose a threat to the safety of others.
>
> [*Ibid.*]

Accordingly, the lifetime registration obligation imposed by Megan's Law cannot be terminated for at least fifteen years, and then only by court order pursuant to *N.J.S.A.* 2C:7-2f, which provides:

> A person required to register under this act may make application to the Superior Court of this State to terminate the obligation upon proof that the person has not committed an offense within 15 years following conviction or release from a

correctional facility for any term of imprisonment imposed, whichever is later, and is not likely to pose a threat to the safety of others.

We also noted in *Doe, supra, id.* at 22, 662 *A.*2d 367, that "[r]egistration records are open to any law enforcement agency in the state, or any other state, or any federal law enforcement agency[,] *N.J.S.A.* 2C:7–5," and that "[f]ailure to comply with the Registration Law is a fourth-degree crime. *N.J.S.A.* 2C:7–2a."

▮ Because the Appellate Division's disposition limited notification to the public school that J.G. attends, we reasonably may infer that notification will terminate when J.G. completes his public school education. Nevertheless, the potential for continued or expanded notification exists pursuant to the Attorney General Guidelines that state that "information which provides evidence of a change in circumstances or in the relevant factors may trigger a reevaluation," and noting further that "a motion for reconsideration may be filed by the registrant or the Prosecutor's Office to obtain a review." Attorney General Guidelines, *supra,* at 49. Pursuant to the limited notification authorized by the Appellate Division, the principal of J.G.'s school will receive a notice that includes "the offender's name and a recent photograph, along with a physical description, specification of the offense of which the offender was convicted or adjudicated [that] renders him subject to the provisions of Megan's Law [and] the address of the offender's place of residence...." *Id.* at 24. Pursuant to the Guidelines, the school principal is authorized in his or her discretion to provide access to the notice to other school personnel whose job duties and contact with school children justify their awareness of the information set forth in the notice. *Id.* at 34–37.

▮ Notwithstanding the clarity of the Legislature's generalized intent to apply Megan's Law to juveniles adjudicated delinquent based on convictions of sex offenses, the judicial task of harmonizing that intent with the protective philosophy underlying the Code of Juvenile Justice, as well as with that statute's specific provisions, is a formidable one. We note at the outset that

approximately one year after the effective date of Megan's Law the Juvenile Code's statement of purpose was amended to provide:

2A:4A–21 Purposes

This act shall be construed so as to effectuate the following purposes:

. . . .

b. Consistent with the protection of the public interest, to remove from children committing delinquent acts certain statutory consequences of criminal behavior, and to substitute therefor an adequate program of supervision, care and rehabilitation, *and a range of sanctions designed to promote accountability and protect the public.*

[ (Emphasis added).]

We infer that that amendment was intended specifically to reflect the applicability of Megan's Law to those juveniles who are adjudicated delinquent. See *N.J.S.A.* 2C:7–2.

Nevertheless, in determining the extent to which the literal provisions of Megan's Law should be applied to unlawful acts committed by a ten-year-old boy, we must take careful cognizance of the philosophy underlying the creation of our separate juvenile justice system, as well as of the specific provisions of our Juvenile Code intended to implement that philosophy. In *In re Gault*, 387 *U.S.* 1, 14–16, 87 *S.Ct.* 1428, 1437–38, 18 *L.Ed.*2d 527, 539–40 (1967), the United States Supreme Court explained the concerns and rationale leading to the establishment of juvenile courts in most jurisdictions:

The history and theory underlying this development are well-known, but a recapitulation is necessary for purposes of this opinion. The juvenile court movement began in this country at the end of the last century. From the Juvenile Court statute adopted in Illinois in 1899, the system has spread to every State in the Union, the District of Columbia, and Puerto Rico. The constitutionality of Juvenile Court laws has been sustained in over 40 jurisdictions against a variety of attacks.

The early reformers were appalled by adult procedures and penalties, and by the fact that children could be given long prison sentences and mixed in jails with hardened criminals. They were profoundly convinced that society's duty to the child could not be confined by the concept of justice alone. They believed that society's role was not to ascertain whether the child was "guilty" or "innocent," but "What is he, how has he become what he is, and what had best be done in his interest and in the interest of the state to save him from a downward career." The child—essentially good, as they saw it—was to be made "to feel that he is the object of [the state's] care and solicitude," not that he was under arrest or on trial.

The rules of criminal procedure were therefore altogether inapplicable. The apparent rigidities, technicalities, and harshness which they observed in both substantive and procedural criminal law were therefore to be discarded. The idea of crime and punishment was to be abandoned. The child was to be "treated" and "rehabilitated" and the procedures, from apprehension through institutionalization, were to be "clinical" rather than punitive.

These results were to be achieved, without coming to conceptual and constitutional grief, by insisting that the proceedings were not adversary, but that the state was proceeding as parens patriae.

. . . .

On this basis, proceedings involving juveniles were described as "civil" not "criminal" and therefore not subject to the requirements which restrict the state when it seeks to deprive a person of his liberty.

Accordingly, the highest motives and most enlightened impulses led to a peculiar system for juveniles, unknown to our law in any comparable context.

[ (Footnotes omitted).]

The Court earlier had expressed similar views in *Kent v. United States*, 383 *U.S.* 541, 554–55, 86 *S.Ct.* 1045, 1054, 16 *L.Ed.*2d 84, 93–94 (1966):

The theory of the District's Juvenile Court Act, like that of other jurisdictions, is rooted in social welfare philosophy rather than in the corpus juris. Its proceedings are designated as civil rather than criminal. The Juvenile Court is theoretically engaged in determining the needs of the child and of society rather than adjudicating criminal conduct. The objectives are to provide measures of guidance and rehabilitation for the child and protection for society, not to fix criminal responsibility, guilt and punishment. The State is parens patriae rather than prosecuting attorney and judge.

[ (Footnotes omitted).]

By the late 1960s, however, dissatisfaction with the operation of juvenile courts led to a nationwide shift in emphasis in the direction of custodial sentences for older juvenile offenders that commit serious crimes. In *McKeiver v. Pennsylvania*, 403 *U.S.* 528, 546 n. 6, 91 *S.Ct.* 1976, 1986 n. 6, 29 *L.Ed.*2d 647, 661 n. 6 (1971), the Supreme Court took note of that trend:

"What is required is rather a revised philosophy of the juvenile court based on the recognition that in the past our reach exceeded our grasp. The spirit that animated the juvenile court movement was fed in part by a humanitarian compassion for offenders who were children. That willingness to understand and treat people who threaten public safety and security should be nurtured, not turned aside as hopeless sentimentality, both because it is civilized and because social protection itself demands constant search for alternatives to the crude and limited expedient of condemnation and punishment. But neither should it be allowed to

outrun reality. The juvenile court is a court of law, charged like other agencies of criminal justice with protecting the community against threatening conduct. Rehabilitating offenders through individualized handling is one way of providing protection, and appropriately the primary way in dealing with children. But the guiding consideration for a court of law that deals with threatening conduct is nonetheless protection of the community. The juvenile court, like other courts, is therefore obliged to employ all the means at hand, not excluding incapacitation, for achieving that protection. What should distinguish the juvenile from the criminal courts is greater emphasis on rehabilitation, not exclusive preoccupation with it."

[ (Quoting President's Commission on Law Enforcement and Administration of Justice, *Task Force Report: Juvenile Delinquency and Youth Crime*, at 9 (1967)).]

That national movement was reflected in New Jersey by the enactment in 1982 of the Code of Juvenile Justice. The Senate Judiciary Statement to Assembly No. 641, the Code of Juvenile Justice bill, states:

This bill recognizes that the public welfare and the best interests of juveniles can be served most effectively through an approach which provides for harsher penalties for juveniles who commit serious acts or who are repetitive offenders, while broadening family responsibility and the use of alternative dispositions for juveniles committing less serious offenses. Moreover, the provisions of this bill and the other accompanying bills reflect a philosophy which is pragmatic and realistic in nature rather than bound to any particular ideology.

[Senate Judiciary Committee, *Statement to Assembly Bill No. 641*, at 1 (February 8, 1982).]

As Justice O'Hern observed, writing for a unanimous Court in *State v. R.G.D.*, 108 *N.J.* 1, 9–10, 527 *A.2d* 834 (1987):

The goal of the new legislation in this regard was to deal more strictly with serious offenders. In keeping with that pragmatic philosophy, the newly revised Code contained, among many others, a change concerning the prosecutor's motion for referral of a case to adult court without the juvenile's consent. *N.J.S.A.* 2A:4A–26. The Act broadened the class of offenders eligible for waiver and revised the standards for waiver in certain cases.

A very significant change in the waiver standard was made with respect to certain serious juvenile offenders. For this group, it was the Legislature's intention to shift the process toward waiver. The legislative statement to the Code of Juvenile Justice summarizes the specific changes made. In order to be eligible for waiver, the juvenile must be fourteen years of age or older at the time of the offense and it must be established that either (a) there is probable cause to believe that the juvenile committed certain serious acts such as criminal homicide, robbery, arson, sexual assault, possession of a firearm, (b) the juvenile had been previously adjudicated delinquent on the basis of a serious offense, or (c) the juvenile committed a delinquent act as a previous offender and had been previously

incarcerated or had committed the delinquent act in a violent manner against a person.

[ (Citation omitted).]

The Court also noted in *R.G.D.*, *supra*, that for juveniles over the age of fourteen, the

[l]ikelihood of "rehabilitation" was retained as a factor bearing upon waiver but was made substantially more difficult to establish. The juvenile has the burden of proof on this issue; and must show the probability that he can be rehabilitated as a juvenile prior to reaching the age of nineteen and, further, that the probability of such rehabilitation "substantially outweighs the reasons for the waiver." *N.J.S.A.* 2A:4A–26a(3).

[108 *N.J.* at 11, 527 *A.2d* 834.]

██ Notwithstanding the Juvenile Code's relaxation of the standards for waiver in the case of older and more serious juvenile offenders, the Juvenile Code affords a variety of safeguards for the general protection of juvenile offenders. Contrary to the notification provisions of Megan's Law, the Juvenile Code provides that "records of law enforcement agencies[ ] pertaining to juveniles charged as a delinquent ... shall be strictly safeguarded from public inspection." *N.J.S.A.* 2A:4A–60a. In general, disclosure of such records is limited to courts, the Attorney General or county prosecutor, any institution in which the juvenile is placed, and the Juvenile Justice Committee. After adjudication, and on request, the adjudication and disposition may be disclosed to the victim, the police department in the municipality where the juvenile resides, and on a confidential basis to the principal of the juvenile's school. *N.J.S.A.* 2A:4A–60. The Juvenile Code also provides that "[n]o disposition under this act shall operate to impose any of the civil disabilities ordinarily imposed by virtue of a criminal conviction...." *N.J.S.A.* 2A:4A–48.

Another significantly protective provision of the Juvenile Code is *N.J.S.A.* 2A:4A–47a which provides:

Any order of disposition entered in a case under this act shall terminate when the juvenile who is the subject of the order attains the age of 18, or three years from the date of the order whichever is later unless such order involves incarceration or is sooner terminated by its terms or by order of the court.

The apparent purpose of that provision—to limit the duration of restrictions and punishments, other than incarceration, imposed as

a result of delinquency adjudications—suggests an apparent tension with the registration requirements of Megan's Law that are of lifetime duration, unless terminated by court order on proof that the registrant has not reoffended for fifteen years and poses no threat to the safety of others. *N.J.S.A.* 2C:7–2f. The Appellate Division reconciled at least the letter of those apparently conflicting provisions in *State in Interest of B.G.,* 289 *N.J.Super.* 361, 674 *A.*2d 178 (1996), by concluding that an order for registration or notification pursuant to Megan's Law did not constitute an "order of disposition" entered in a case under the Juvenile Code. *Id.* at 373, 674 *A.*2d 178. Although we are in accord with the Appellate Division's statutory interpretation, the philosophical conflict between the two statutes is less easily resolved. The Juvenile Code's determination that a disposition intended to discipline or rehabilitate an adjudicated delinquent should terminate after three years or at age eighteen, whichever is later, sharply contrasts with the potentially lifetime registration requirement imposed by Megan's Law.

■ We also are influenced by a significant distinction in the Juvenile Code between juveniles over and under the age of fourteen. We previously have adverted to the waiver provision set forth in *N.J.S.A.* 2A:4A–26 pursuant to which the Family Part on the prosecutor's motion shall, without the juvenile's consent, waive jurisdiction to permit juveniles over fourteen years of age to be tried as adults if they are charged with certain specified offenses and the juvenile is unable to prove that the probability of rehabilitation before age nineteen outweighs the need for waiver. That provision reflects a clear legislative determination that children under fourteen, no matter how serious the offenses with which they are charged, simply are too immature as a matter of law to be tried as an adult.

Other statutory and rule provisions reflect the important distinction between juveniles over and under the age of fourteen. *See, e.g., N.J.S.A.* 2A:4A–35 (authorizing under specified circumstances release of juveniles over age fourteen on their own recog-

nizance); *N.J.S.A.* 2A:4A–61 (authorizing for juveniles over fourteen photographs and retention of fingerprint records for criminal identification purposes); *R.* 5:22–1 (authorizing juveniles over fourteen charged with delinquency to elect to have proceeding transferred to appropriate court and prosecuting authority). *See also In re the Commitment of N.N.*, 146 *N.J.* 112, 136–37, 679 *A.*2d 1174 (1996) (acknowledging soundness of Civil Practice Committee's proposal that in involuntary commitment proceedings involving minors over age fourteen constitutional due process protections should apply).

This Court recently underscored the important difference in the legal status of juveniles over and under the age of fourteen. In *State v. Presha,* 163 *N.J.* 304, 748 *A.*2d 1108 (2000) we considered the voluntariness of a confession by a seventeen-year-old juvenile defendant in a custodial setting. Applying a totality of circumstances standard we held that the confession was voluntary even though no parent was present. *Id.* at 308, 748 *A.*2d 1108. We observed, however, that in the case of juveniles under the age of fourteen

> we believe an evaluation of the totality of circumstances would be insufficient to assure the knowing, intelligent, and voluntary waiver of rights. Accordingly, when a parent or legal guardian is absent from an interrogation involving a juvenile that young, any confession resulting from the interrogation should be deemed inadmissible as a matter of law, unless the adult was unwilling to be present or truly unavailable. That approach is consistent with other jurisdictions that have recently adopted the same or similar rule.
>
> [*Id.* at 315, 748 *A.*2d 1108.]

The recognition in our statutory and decisional law of a substantial distinction in the criminal responsibility of juveniles over and under the age of fourteen traces its roots to the infancy defense at common law. In *State v. Monahan,* 15 *N.J.* 34, 104 *A.*2d 21 (1954), Justice Heher explained in detail the principles of the infancy defense:

> Under the common law, a child is not criminally responsible "unless he is old enough, and intelligent enough, to be capable of entertaining a criminal intent; and to be capable of entertaining a criminal intent he must be capable of distinguishing between right and wrong as to the particular act."

Children under the age of seven years are, by an arbitrary rule of the common law, conclusively presumed to be ... incapable of entertaining a criminal intent, and no evidence at all can be received to show capacity in fact. This rule applies to both common-law and statutory offenses.

The presumption of such incapacity as to children between the ages of seven and 14 is not conclusive, as in cases of children under the age of seven, but rebuttable in the particular case by a showing of sufficient intelligence to distinguish between right and wrong, and to understand the nature and illegality of the particular act, or, as it is sometimes said, that he was possessed of "a mischievous discretion." The burden of proving capacity in this latter age group is upon the state; and capacity must be shown beyond any reasonable doubt.

Children over the age of 14 are presumed to be ... responsible, but the presumption is rebuttable, with the burden on the accused to satisfy the jury that he did not have sufficient intelligence to understand the nature and consequences of his act, and to know that he was doing wrong.

[*Id.* at 48, 104 *A.*2d 21 (Heher, J. concurring) (citations omitted).]

*Accord, In re Devon T.,* 85 *Md.App.* 674, 584 *A.*2d 1287, 1290 (1991); Clark & Marshall, *Crimes* 391–92 (6th ed.1958); W. La-Fave & A. Scott, *Substantive Criminal Law* 398–99 (2d ed.1986); R. Perkins & R. Boyce, *Criminal Law* 936 (3d ed.1982). Commentators have explained that the infancy defense at common law embodied prevailing views concerning a child's capacity to take responsibility for criminal acts:

At common law the infancy defense was grounded in an unwillingness to punish individuals incapable of forming criminal intent and thus incapable of assuming responsibility for their acts. Linked to that normative imperative was the common sense judgment that punishment cannot deter an individual from commission of future wrongful acts where he is in fact incapable of knowing right from wrong.

[Andrew Walkover, *The Infancy Defense in the New Juvenile Court,* 31 *UCLA L.Rev.* 503, 512 (1984) (footnotes omitted).]

We also note that although all states have enacted versions of Megan's Law, substantial variations exist among the different statutes concerning the applicability of registration and notification requirements to juveniles. A substantial number of state statutes do not expressly include in or exclude juveniles from their version of Megan's Law.[1] Five states subject only juvenile sex offenders tried and convicted as adults to a registration obli-

---

[1] *Fla. Stat. Ann.* § 775.21 (West 2000 & Supp.2001); *Md.Code Ann.,* Crimes and Punishments § 792 (Lexis Supp.2000); *Mont.Code Ann.* §§ 46–23–501 to – 508 (West 1999 & Supp.2000); *Neb.Rev.Stat. Ann.* § 29–4003 (West 1996 &

gation.[2] Alabama excludes juveniles entirely from its registration and notification laws.[3] Three states expressly exclude juveniles who are eighteen years of age or younger if they committed a sex offense against a victim who is a minor.[4]

Although twenty-four states apply their registration requirements to juvenile sex offenders,[5] many states impose burdens less severe than the New Jersey statute. For example, for juveniles

---

Supp.2000); *N.H.Rev.Stat. Ann.* §§ 651–B:1 to –9 (Lexis Supp.2000); *N.Y. Correction Law* §§ 168–a to –v (McKinney Supp.2000); *Ohio Rev.Code Ann.* §§ 2950.01 to –.99 (Anderson 1999 & Supp.2000); *Okla. Stat. Ann.* tit. 57, §§ 581 to –589 (West 1991 & Supp.2001); 42 *Pa. Cons.Stat. Ann.* §§ 9791 to 9799.7 (West 1998 & Supp.2001); *Tenn.Code Ann.* §§ 40–39–101 to –110 (Michie 1997 & Supp.2001); *Utah Code Ann.* § 77–27–21.5 (Lexis 1999 & Supp.2000); *Vt. Stat. Ann.* tit. 13, §§ 5401 to –5413 (Lexis 1998 & Supp.2000); *W. Va.Code* §§ 15–12–1 to –10 (Lexis 2000 & Michie Supp.2000).

2 *Alaska Stat.* §§ 12.63.010 to –.100 (Lexis 2000); *Del.Code. Ann.* tit. 11, §§ 4120 to –4122 (1987 & Michie Supp.2000); *La.Rev.Stat. Ann.* §§ 15:540 to – 549 (West 1992 & Supp.2001); *Me.Rev.Stat. Ann.* tit 34–A, §§ 11201 to –11252 (West Supp.2000); *Mo. Ann. Stat.* §§ 589.400 to –.425 (West Supp.2001).

3 *Ala.Code* §§ 13A–11–200 to –203 (1994).

4 *Ga.Code Ann.* § 42–1–12 (1997 & Lexis Supp.2000); *Haw.Rev.Stat. Ann.* §§ 846E–1 to –9 (Michie 1999); *Wyo. Stat.* §§ 7–19–301(a)(xii)(A) (Lexis 1999 & Supp.2000).

5 *Ariz.Rev.Stat. Ann.* §§ 13–3821 to –27 (West 2001); *Ark.Code Ann.* §§ 12–12– 901 to –920 (Lexis 1999); *Cal.Penal Code* § 290 to –.95 (West 1999 & Supp. 2001); *Colo.Rev.Stat. Ann.* § 18–3–412.5 (West 1999 & Supp.2001); *Conn. Gen.Stat. Ann.* §§ 54–250 to –261 (West 1994 & Supp.2001); 730 *Ill. Comp. Stat. Ann.* 15% to –/10; 152/101 to –99 (West 1997 & Supp.2001); *Ind.Code Ann.* §§ 5–2–12–1 to –13 (West Supp.2000); *Iowa Code Ann.* §§ 692A.1 to –.16 (West Supp.2001); *Kan. Stat. Ann.* §§ 22–4901 to –10 (1995 & West Supp.2000); *Ky.Rev.Stat. Ann.* §§ 17.500 to –.991 (Michie 1996 and Lexis Supp.2000); *Mass. Ann. Laws* ch. 6, §§ 178C to –178P (Law. Co–op.1997 & Lexis Supp.2001); *Mich. Comp. Laws* §§ 28.721 to –.732 (2001); *Minn.Stat. Ann.* § 243.166 (West Supp.2001); *Miss.Code. Ann.* §§ 45–33–21 to –57 (1999 & West Supp.2000); *N.M. Stat. Ann.* §§ 29–11A–1 to –8 (Michie 1978 & Supp.2000); *N.C. Gen.Stat.* §§ 14–208.5 to –.32 (Lexis 1999 & Supp.2000); *N.D. Cent.Code* § 12.1–32–15 (Michie Supp.1999); *Or.Rev.Stat.* §§ 181.585 to –.606 (Lexis 1999); *R.I. Gen. Laws* § 11–37.1–1 to –19 (West Supp.2000); *S.C.Code Ann.* §§ 23–3–400 to –520 (West Supp.2000); *Tex.Crim. P.Code Ann.* §§ 62.01 to –.12 (West Supp.2001);

adjudicated delinquent, three states terminate registration at age twenty-five,[6] and one state, North Carolina, terminates registration at age eighteen.[7] California restricts registration to offenders who commit the most serious sex offenses, such as rape.[8] In Iowa, Arkansas, and Colorado, registration is subject to the juvenile court's discretion;[9] in Indiana, registration is required only on the basis of clear and convincing evidence of a likelihood of reoffense;[10] and in Mississippi, registration is required only after a juvenile has twice been adjudicated delinquent based on a sex offense.[11] The Washington statute permits juvenile sex offenders over fifteen to avoid registration on proof by clear and convincing evidence that their registration will not serve the underlying legislative purpose, and applies a preponderance of the evidence standard for juveniles under fifteen who have not reoffended.[12]

In seven states where community notification laws apply to juveniles, notification is permissive rather than mandatory as it is in New Jersey.[13] Four states have enacted separate registration

---

*Va.Code Ann.* §§ 19.2–298.1 to –.4 (Lexis 2000); *Wash. Rev.Code Ann.* §§ 9A.44.130 to –.145 (West 2000 & Supp.2000); *Wis. Stat. Ann.* §§ 301.45 to –.46 (West 1999 & Supp.2000).

[6] *Ariz.Rev.Stat. Ann.* §§ 13–3821 to –27 (West 2001); *Cal.Penal Code* § 290 to –.95 (West 1999 & Supp.2001); *Mo. Ann. Stat.* § 211.425 (West Supp.2001).

[7] *N.C. Gen.Stat.* §§ 14–208.5 to –.32 (Lexis 1999 & Supp.2000).

[8] *Cal.Penal Code* § 290(d)(3) (West 1999 & Supp.2001).

[9] *Ark.Code Ann.* §§ 12–12–903(7)(c) (Lexis 1999); *Colo.Rev.Stat. Ann.* § 18–3–412.5(8.5) (West 1999 & Supp.2001); *Iowa Code Ann.* §§ 692A.2(4) (West Supp.2001).

[10] *Ind.Code Ann.* § 5–2–12.4(3)(c) (West Supp.2000).

[11] *Miss.Code. Ann.* § 45–33–25 (1999 & West Supp.2000).

[12] *Wash. Rev.Code. Ann.* § 9A.44.140(4) (West 2000 & Supp.2000).

[13] *Ark.Code Ann.* §§ 12–12–901 to –920 (Lexis 1999); *Colo.Rev.Stat. Ann.* § 18–3–412.5 (West 1999 & Supp.2001); *Conn. Gen.Stat. Ann.* §§ 54–250 to –261

and notification laws designed specifically for juvenile sex offenders and give courts discretion when applying those laws.[14]

### III

### A

We first address petitioner's contention that the Law Division erred in its determination that J.G.'s RRAS score was forty-two, resulting in a Tier 2 classification. J.G. contends that the State's failure to prove penetration by clear and convincing evidence should have diminished his RRAS score by fifteen points, leading to a Tier 1 classification.

In *E.B. v. Verniero*, 119 *F*.3d 1077 (3d Cir.1997), the Third Circuit Court of Appeals held that in a Megan's Law proceeding to establish a sex offender's tier classification and the applicable scope of community notification, the State bears the burden of proving the relevant facts on which it relies by clear and convincing evidence. *Id.* at 1109. That court observed:

> We must, therefore, ask whether the preponderance of evidence standard, which "allocates the risk of error nearly equally" between an erroneous overestimation or underestimation of a registrant's future dangerousness, "reflect[s] properly the [ ] relative severity" of these erroneous outcomes. *Addington* supplies the answer. Because "the possible injury to the individual [registrant] is significantly greater than any possible harm to the state," the registrant, consistent with due process, cannot "be asked to share equally with society the risk of error." It necessarily follows that the Due Process Clause requires that the state prove its case by clear and convincing evidence in a Megan's Law proceeding.
>
> [119 *F*.3d at 1111 (citations omitted).]

In other contexts, this Court has characterized clear and convincing evidence as evidence on which the trier of fact can rest "a

---

(West 1994 & Supp.2001); *Iowa Code Ann.* §§ 692A.1 to –.16 (West Supp.2001); *Kan. Stat. Ann.* §§ 22–4901 to –10 (1995 & West Supp.2000); *N.D. Cent.Code* § 12.1–32–15(2)(c) (Michie Supp.1999); *R.I. Gen. Laws* § 11–37.1–4 (West Supp. 2000).

14 *Idaho Code* §§ 18–8301 to –26 (1997 & Michie Supp.2000); *Mo. Ann. Stat.* § 211.425 (West Supp.2001); *N.C. Gen.Stat.* § 14–208.26 (Lexis 1999 & Supp. 2000); *Nev.Rev.Stat. Ann.* §§ 62.500 to –.600 (Lexis 2001).

firm belief or conviction as to the truth of the allegations sought to be established." *Matter of Purrazzella,* 134 *N.J.* 228, 240, 633 *A.*2d 507 (1993) (citation and internal quotation marks omitted). It must be "so clear, direct and weighty and convincing as to enable either a judge or jury to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *In re Registrant R.F.,* 317 *N.J.Super.* 379, 384, 722 *A.*2d 538 (App.Div. 1998) (quoting *In re Seaman,* 133 *N.J.* 67, 74, 627 *A.*2d 106, 109 (1993)).

■ On this record we are unpersuaded that J.G.'s penetration of his eight-year-old cousin was established by clear and convincing evidence. As noted, *ante* at 318, 777 *A.*2d at 899, the trial court's conclusion concerning penetration was based largely on an extremely brief interrogation of J.G. by the Public Defender at the Family Part proceeding:

Q. [J.G.], at the time, you indicated that you did try to penetrate P.D., correct?

A. Yeah.

Q. And you did—although you didn't actually get full penetration, there was some penetration, correct?

A. Yes.

THE COURT: And there was no severe personal injury?

MR. BAULDOCK: None, Judge.

THE COURT: Okay. It was you that was trying to do this, right, J.G.?

[J.G.]: Yes.

We note that although J.G. provided the foregoing testimony at the Family Part plea hearing on May 9, 1996, Linda Pangalos, J.G.'s expert witness who was also the therapist that had been treating J.G. for the preceding eight months, was not consulted by J.G.'s counsel before the plea hearing. Her uncontradicted testimony at the Megan's Law hearing established that when J.G. entered counseling his primary language was Spanish, school-study teams had classified him as multiple-handicapped and perceptually impaired, he was incapable of reading and spelling simple words and had difficulty with abstract reasoning. Moreover, she testified that J.G. then lacked a basic understanding of the meaning of words like "rape," "sex," and "penetration." She

concluded, primarily on the basis of her extensive opportunities to interview and interrogate J.G. during forty-five months of counseling, that J.G. had not penetrated either his cousin or his sister on the occasion in question.

This Court previously has held that "expert testimony may be introduced at the judicial hearing in order to establish the existence of unique aspects of a registrant's offense or character that render the scale score suspect." *In re Registrant G.B.*, 147 *N.J.* 62, 69, 685 *A.*2d 1252 (1996). In our view, the testimony offered by Linda Pangalos significantly undermines the reliability of J.G.'s admission at the plea hearing.

We also note that the Law Division judge was not present at the Family Court plea hearing, and therefore his credibility determination was not made first-hand. We also take into account that J.G. was only eleven years old when he testified, that his plea hearing testimony was extremely brief, and that his answers were so obviously responsive to leading questions posed by his counsel that we cannot have confidence that he comprehended either the meaning of the question or the significance of his answers. Our conclusion also is influenced by the medical report of the examination of J.G.'s sister that found no evidence of penetration in her case, as well as by the two reports of the investigating police detective who interviewed all of the witnesses, including the victims, J.G., and J.G.'s older sister, and stated in his report that "[i]t could not be determined if there was penetration or not."

On the totality of this record, we are thoroughly persuaded that the Law Division's conclusion that penetration was proved by clear and convincing evidence is not sustainable. In reaching that conclusion, we imply no departure from the settled principle of finality that attends guilty pleas accompanied by an adequate factual basis. See *State ex rel. T.M.*, 166 *N.J.* 319, 325–27, 765 *A.*2d 735 (2001); *State v. Smullen*, 118 *N.J.* 408, 414–17, 571 *A.*2d 1305 (1990). Although a substantial challenge to the factual basis for J.G.'s plea might have been asserted, the question before us is not the validity of the plea but rather whether, for purposes of the

RRAS score, penetration of J.G.'s cousin was established by clear and convincing evidence. We note that because of the downgrade of the charges against J.G., and the prosecutor's acquiescence to a probationary term, the Family Part may have been somewhat inattentive to its duty to elicit from J.G. a knowing and informed acknowledgment that penetration of his cousin had in fact occurred, beyond the perfunctory interrogation that occurred at the plea hearing. In these unique circumstances, we are persuaded that neither the plea hearing, nor the collateral evidence before the Law Division, established penetration by clear and convincing evidence. *Cf. State v. Staten*, 327 *N.J.Super.* 349, 359–60, 743 *A.2d* 365 (App.Div.2000) (requiring defendant who pled guilty to second-degree aggravated assault but sought to challenge NERA sentence to move to withdraw guilty plea because factual basis for plea supported NERA sentence). Moreover, contrary to the assertion in Justice Coleman's separate opinion, *post* at 343, 777 *A.2d* 915, this Court in attorney disciplinary proceedings has not been unwilling to consider independently evidence that is inconsistent with an essential element of the underlying criminal conviction. See *In re Tonzola*, 162 *N.J.* 296, 305–08, 744 *A.2d* 162 (2000); *Matter of Goldberg*, 109 *N.J.* 163, 169–70, 536 *A.2d* 224 (1988). Based on our conclusion that the Law Division's finding on penetration is not sustainable, we reduce J.G.'s RRAS score to twenty-seven, resulting in a Tier 1 classification.

■ We add these additional observations on the issue of J.G.'s RRAS score. The Court is concerned that the Attorney General's Guidelines and the RRAS, in their present form, do not adequately distinguish adult and juvenile offenders and specifically do not take into account the issues unique to juvenile offenders below age fourteen. We note, for example, that a registrant's RRAS score will be substantially higher if the victim is under age thirteen. Because ten-year-old juvenile offenders such as J.G. are unlikely to accost victims significantly older than themselves, that feature of the RRAS may unfairly inflate the score of younger offenders. Moreover, because youthful sex offenders such as J.G. may lack

criminal capacity, or even comprehension about the nature and consequences of their actions, we believe the Guidelines and the RRAS require review and modification to reflect factors and issues unique to such youthful offenders. We encourage the Attorney General to undertake that review and modification. Pending such modification, Law Division judges presiding over Megan's Law proceedings involving juveniles under age fourteen are cautioned to exercise special care and discretion in determining whether the RRAS score is a reliable basis for tier classification.

### B

■ Before addressing J.G.'s challenges to the constitutionality of the registration and notification provisions of Megan's Law, we first consider whether the lifetime registration requirement imposed by Megan's Law on a ten-year-old juvenile adjudicated delinquent as a sex offender is reconcilable with the Juvenile Code's prohibition against trying juveniles under fourteen as adults and its mandate to terminate all dispositions other than incarceration at age eighteen, or within three years, whichever is later. When this Court is confronted with conflicting statutory provisions that relate to a common subject, we strive to reconcile the inconsistent provisions and to interpret them harmoniously. *See Oches v. Township of Middletown Police Dept.*, 155 *N.J.* 1, 5, 713 *A.2d* 993 (1998) (citing *Loboda v. Township of Clark*, 40 *N.J.* 424, 435, 193 *A.2d* 97 (1963)); *see also* 2B Norman J. Singer, *Sutherland Statutory Construction* § 51.02 at 191 (6th ed.2000) (stating that statutes on same subject, "although in apparent conflict, are construed to be in harmony if reasonably possible.").

In *Doe v. Poritz, supra*, 142 *N.J.* at 12, 662 *A.2d* 367, we sustained the validity of Megan's Law in the face of multiple constitutional challenges. We stated: "The essence of our decision is that the Constitution does not prevent society from attempting to protect itself from convicted sex offenders, no matter when convicted, so long as the means of protection are reasonably

designed for that purpose and only for that purpose, and not designed to punish." We also observed, although Megan's Law's application to juveniles was not in issue, that the Law "applies to juveniles, similarly an unlikely target for double punishment but included for remedial protective purposes." *Id.* at 74, 662 *A.*2d 367.

In imposing a registration requirement on all persons convicted or adjudicated delinquent for commission of a sex offense, *N.J.S.A.* 2C:7–2, the Legislature made no attempt to distinguish between juveniles over fourteen tried and convicted as adults after a waiver of Family Part jurisdiction, *N.J.S.A.* 2A:4A–26, juveniles over fourteen adjudicated delinquent by the Family Part, and juveniles under fourteen adjudicated delinquent by the Family Part. In our view, a distinction concerning at least the latter group is essential if we are to sensibly reconcile the Juvenile Code with Megan's Law. Absent that distinction, the rehabilitative purpose that is at the core of the Juvenile Code would be substantially frustrated.

■■■ As noted, *N.J.S.A.* 2A:4A–21 provides in part:

This act shall be construed so as to effectuate the following purposes:

. . . .

b. Consistent with the protection of the public interest, to remove from children committing delinquent acts certain statutory consequences of criminal behavior, *and to substitute therefor an adequate program of supervision, care and rehabilitation,* and a range of sanctions designed to promote accountability and protect the public.

[ (Emphasis added).]

Reflecting the Juvenile Code's emphasis on supervision, care and rehabilitation, the Code's dispositional section, *N.J.S.A.* 2A:4A–43, authorizes a wide variety of appropriate dispositional alternatives other than incarceration for juveniles adjudicated delinquent, including individual counseling, academic or vocational education, work programs, community services and family counseling. The Juvenile Code also limits the duration of dispositions imposed on juveniles by providing that all orders of disposition other than for incarceration in delinquency cases shall terminate at age eighteen,

or three years from the date of the order, whichever is later. Moreover, as noted, *ante* at 324, 777 *A.2d* at 904, the Code states that no disposition "shall operate to impose any of the civil disabilities ordinarily imposed by virtue of a criminal conviction...." *N.J.S.A.* 2A:4A–48.

We also noted earlier the widely-accepted common law rule that juveniles between the ages of seven and fourteen presumptively lacked capacity to commit crime, a presumption rebuttable by the State. At J.G.'s plea hearing neither the interrogation nor J.G.'s testimony addressed in depth whether J.G. possessed the requisite criminal intent to commit the crime of sexual assault. On the record before us, a fair conclusion is that the issue of criminal capacity was ignored because the court's disposition—mandatory counseling at the Family Growth program combined with a three-year probationary term to coincide with the anticipated duration of J.G.'s counseling—constituted a pragmatic effort to rehabilitate J.G. and to deal with his inappropriate sexual behavior, irrespective of whether it was venal or simply misguided. Accordingly, without purporting to determine whether J.G. was a compulsive, or even a deliberate, sex offender or whether he was reasonably likely to reoffend, the Family Part sensibly resolved the charges by requiring J.G. to complete a counseling program intended to achieve complete rehabilitation.

In the context of the Family Court proceeding resulting in J.G.'s delinquency adjudication, which we infer to be reasonably characteristic of delinquency proceedings involving other juveniles under the age of fourteen, we regard as implausible and anomalous the notion that a child "sex offender" such as J.G. should pursuant to Megan's Law be subject to a lifetime registration requirement merely on the basis of a delinquency adjudication that included no effort to assess his true culpability. See *Strasenburgh v. Straubmuller,* 146 *N.J.* 527, 541, 683 *A.2d* 818 (1996) (" 'It is a venerable principle that a law will not be interpreted to produce absurd results.' ") (quoting *K Mart Corp. v. Cartier, Inc.,*

486 *U.S.* 281, 325 n. 2, 108 *S.Ct.* 1811, 1835, n. 2, 100 *L.Ed.*2d 313, 345, n. 2 (Scalia, J., concurring in part and dissenting in part)).

 Accordingly, we shall attempt to harmonize Megan's Law and the Juvenile Code in a manner that in our view best reflects the legislative objectives underlying both statutes. Although we acknowledge that registration and community notification do not constitute dispositions pursuant to the Juvenile Code, we hold, consistent with the purpose underlying *N.J.S.A.* 2A:4A–47(a), that with respect to juveniles adjudicated delinquent for sexual offenses committed when they were under age fourteen Megan's Law registration and community notification orders shall terminate at age eighteen if the Law Division, after a hearing held on motion of the adjudicated delinquent, determines on the basis of clear and convincing evidence that the delinquent is not likely to pose a threat to the safety of others. We import that standard, but with a higher burden of proof, from *N.J.S.A.* 2C:7–2, the provision of Megan's Law that authorizes the termination of registration obligations of persons who have not committed a sex offense within fifteen years of conviction or release from a correctional facility, whichever is later. Eligible delinquents unable to satisfy that high standard of proof will continue to be subject to the registration and notification provisions of Megan's Law. But with respect to those adjudicated delinquents whose proofs meet that standard, and whose youthfulness at the time of the offense rendered uncertain his or her criminal capacity and future dangerousness, we believe our holding is faithful to the rehabilitative goals of the Juvenile Code without undermining the salutary objectives of Megan's Law.

C

 Notwithstanding our holding that J.G.'s classification should be reduced from Tier 2 to Tier 1, we do not disturb the notification requirement imposed by the Appellate Division, which limited notification to the school that J.G. presently is attending or, in the future, will attend. We note that that limitation on

notification is consistent with *N.J.S.A.* 2A:4A–60c(3), the disclosure provision of the Juvenile Code that provides:

c. At the time of charge, adjudication or disposition, information as to the identity of a juvenile charged with an offense, the offense charged, the adjudication and disposition shall, upon request, be disclosed to:

. . . .

(3) On a confidential basis, the principal of the school where the juvenile is enrolled for use by the principal and such members of the staff and faculty of the school as the principal deems appropriate for maintaining order, safety or discipline in the school or to planning programs relevant to the juvenile's educational and social development, provided that no record of such information shall be maintained except as authorized by regulation of the Department of Education.

Accordingly, because the notification permitted by the Appellate Division to J.G.'s school is essentially consistent with the disclosure authorized by the Juvenile Code, we will affirm that aspect of the Appellate Division's judgment.

## D

We address briefly J.G.'s constitutional arguments focusing on the application of Megan's Law to juveniles. As noted, in *Doe v. Poritz, supra,* 142 *N.J.* at 12, 110–11, 662 *A.*2d 367, this Court generally upheld the constitutionality of Megan's Law.

J.G. asserts that his due process rights were violated because of the delay in conducting a hearing to determine his tier classification and because he was denied a jury trial. We reject both contentions. Some of the delay in setting a hearing date was attributable to the State's belief that J.G.'s counsel intended to challenge his plea by filing a post-conviction relief application. When that strategy was abandoned, the State did not aggressively seek to schedule a hearing, but we are satisfied that any delay in that respect was insignificant. Concerning the right to jury trial, the United States Supreme Court has determined that "trial by jury in the juvenile court's adjudicative stage is not a constitutional requirement." *McKeiver, supra,* 403 *U.S.* at 545, 91 *S.Ct.* at 1986, 29 *L.Ed.*2d at 661. Our Juvenile Code, *N.J.S.A.* 2A:4A–40, reflects that holding:

All rights guaranteed to criminal defendants by the Constitution of the United States and the Constitution of this State, except the right to indictment, the right to trial by jury and the right to bail, shall be applicable to cases arising under this act.

■ J.G. also asserts that the lifetime registration requirement of Megan's Law constitutes cruel and unusual punishment in violation of the federal and state constitutions. We reject that contention in view of our determination to terminate registration and notification requirements at age eighteen for adjudicated delinquents whose sex offenses were committed prior to age fourteen and who prove by clear and convincing evidence that they are not likely to pose a threat to the safety of others.

■ J.G. further contends that the registration and notification requirements of Megan's Law violate the equal protection clause of the United States Constitution, and that those requirements violate the fundamental right to freedom of movement. We find no merit in either contention.

## IV

In enacting Megan's Law, the Legislature emphatically determined that the citizens of New Jersey should be protected "from convicted sex offenders, no matter when convicted, so long as the means of protection are reasonably designed for that purpose and only that purpose, and not designed to punish...." *Doe, supra,* 142 *N.J.* at 12, 662 *A.2d* 367. To achieve that goal, the Legislature established broad registration and community notification procedures, targeting all sex offenders including older juveniles and adult offenders convicted in the Law Division, juveniles adjudicated delinquent, and those charged with sex offenses but acquitted by reason of insanity.

In this appeal we are confronted with a juvenile adjudicated delinquent for a sex offense committed when he was only ten years old that implicates Megan's Law. We recognize that the Legislature may in the future determine to address more specifically the application of Megan's Law to juveniles who commit sex

offenses when under the age of fourteen. In the interim, however, our clear responsibility is to reconcile the expansive provisions of Megan's Law, enacted in 1994, to protect the public from sex offenders who present a significant risk of reoffending, with the provisions of the Juvenile Code, enacted by the Legislature in 1982, that encompass numerous protections for juveniles, especially those under age fourteen, designed to protect their confidentiality, secure their rehabilitation, and insulate them from the criminal justice system.

Were we writing on a clean slate, our inclination would be to exclude juveniles under age fourteen from the sweeping provisions of Megan's Law. In many instances, sexually improper behavior by such young children is more a reflection of inadequate adult supervision, immaturity, inappropriate media exposure, or a prior history of emotional abuse than it is of irremediable sexually predatory inclinations. Repeat offenders would present more serious concerns, but the provisions of the Juvenile Code authorizing notification to the county prosecutor, local police, and school officials are designed for young children who may pose a risk to others.

Deferring to the legislative judgment, however, we have endeavored to strike a balance that takes into account the youth and immaturity of this ten-year-old offender and interprets Megan's Law in a manner that is faithful to the underlying legislative goals, but nevertheless is reconcilable with the somewhat different vision of juvenile justice reflected in the beneficent provisions of the Juvenile Code. We are confident that that balance fully accommodates the legislative concern for public safety, while recognizing the possibility that inappropriate sexual behavior by young children can be remediated with early intervention by skilled professionals.

For the reasons stated, we affirm in part, reverse in part and modify in part the judgment of the Appellate Division.

COLEMAN, J., concurring in part and dissenting in part.

I concur in the Court's disposition of this appeal in all respects except for its conclusion that in proceedings to determine the proper Megan's Law tier classification of a juvenile adjudicated to be a delinquent based on his guilty plea, the trial court may find, based on clear and convincing evidence, that an element of the sexual offense was not established. *Ante* at 330, 777 *A*.2d at 907–08. That conclusion permits a collateral attack on the order of disposition (which would be a judgment of conviction if J.G. were an adult) that is contrary to law and logic. Hence, I dissent from that holding.

## I.

On May 6, 1996, J.G. pled guilty to conduct that, if committed by an adult, would have constituted the crime of second-degree sexual assault based on committing "an act of sexual penetration with another person ... [while using] physical force or coercion, but the victim does not sustain severe personal injury." *N.J.S.A.* 2C:14–2c(1). In proceedings to establish J.G.'s Megan's Law tier classification for community notification purposes, the trial court and the Appellate Division rejected J.G.'s legal claim of a right to assert that he did not penetrate the victim and that the current evidence supported that claim, notwithstanding the fact that the judgment adjudicating him a delinquent had not been vacated.

At the plea hearing, J.G. admitted that he had penetrated the victim in the following colloquy:

Q. And you also tried to insert your privates into P.D.'s privates, correct?

A. Yes.

....

Q. [J.G.], at the time, you indicated that you did try to penetrate P.D., correct?

A. Yeah.

Q. And you did—although you didn't actually get full penetration, there was some penetration, correct?

A. Yes.

Under our Code of Criminal Justice, that testimony satisfied the sexual penetration required for an adjudication of delinquency for an offense under *N.J.S.A.* 2C:14–2c(1). When J.G. admitted that he partially penetrated the victim, that satisfied the statutory definition of "sexual penetration" because "[t]he depth of insertion [is not] relevant as to the question of commission of the crime." *N.J.S.A.* 2C:14–1c.

Although I agree with the majority that proper protocol was not followed during the plea proceedings, the fact remains that the adjudication of delinquency based on that plea has not been vacated. Indeed, the record reflects that a motion to withdraw the plea was filed—and it appears to have had substantial merit— but it was withdrawn. In addition to a motion to withdraw his plea under *Rule* 3:9–3(e), J.G. could have pursued his rights through a direct appeal, *State v. Butler*, 89 *N.J.* 220, 224, 445 *A.*2d 399 (1982), or in an application for post-conviction relief. At this stage, this Court should have directed that the motion to withdraw the guilty plea be decided by the trial court before proceeding with the merits of this appeal. That said, I disagree with the majority's holding that the trial court should have permitted J.G. to collaterally attack his guilty plea at the Megan's Law tier classification hearing.

In considering whether a trial court sitting in a Megan's Law tier notification proceeding should be permitted to revisit whether an element of the sex offense to which the registrant has entered a guilty plea has been satisfied, a useful analogous guide is found in our license revocation and attorney disciplinary cases.

In *State, Dep't of Law & Pub. Safety v. Gonzalez*, 142 *N.J.* 618, 667 *A.*2d 684 (1995), a casino license revocation case, we explained that "a guilty plea leading to a judgment of conviction has the force of an admission of guilt on the charge based on a defendant's sworn factual statement[s]." *Id.* at 630, 667 *A.*2d 684. We have recognized that in certain proceedings in which the underlying purpose is to protect the public, a criminal conviction is conclusive proof of guilt and the facts of guilt cannot be relitigated. *Id.* at

623, 667 A.2d 684 (stating that "because of the strong public policy of maintaining integrity in the casino industry, a casino employee may not present evidence contradicting his or her convictions" at an employee license revocation hearing); *In re Goldberg,* 142 *N.J.* 557, 565, 666 A.2d 529 (1995) (holding that a criminal conviction based on a guilty plea is "conclusive evidence of respondent's guilt in [attorney] disciplinary proceedings"). "No independent examination of the underlying facts is, therefore, necessary to ascertain guilt." *In re Power,* 114 *N.J.* 540, 544, 555 A.2d 1107 (1989); *accord In re Leahey,* 118 *N.J.* 578, 580–81, 573 A.2d 155 (1990); *In re Addonizio,* 95 *N.J.* 121, 123, 469 A.2d 492 (1984) (citing *In re Rosen,* 88 *N.J.* 1, 3, 438 A.2d 316 (1981)).

In Megan's Law tier determination hearings involving guilty pleas or verdicts, as in attorney disciplinary proceedings based on criminal convictions obtained through guilty pleas or verdicts, the only evidence a registrant is permitted to present is that which "is not inconsistent with the essential elements of the criminal matter for which [he or she] was convicted or has admitted guilt as determined by the statute defining the criminal matter." *R.* 1:20–13(c)(2). Here, the majority has violated that principle by holding that the court conducting the tier classification hearing should not only have entertained evidence that was inconsistent with the sexual penetration element of the offense under *N.J.S.A.* 2C:14–2c(1), but that the court should have found that there was no sexual penetration. I believe that the Legislature intended to give preclusive effect to judgments or orders adjudicating delinquency and judgments of convictions in order to achieve the purpose of Megan's Law—to protect the public. *N.J.S.A.* 2C:7–1a. Regardless of what may have caused J.G. to enter his guilty plea, "convictions based thereon that have not been vacated by a court of competent jurisdiction stand as *conclusive* evidence of guilt for all purposes" under Megan's Law. *Gonzalez, supra,* 142 *N.J.* at 633, 667 A.2d 684.

The majority labors under the misconception that the impact of its holding will be tempered by requiring the Megan's Law tier

classification court to be convinced by clear and convincing evidence before making a finding that is inconsistent with a guilty plea or verdict. That reliance is entirely misplaced. The clear and convincing evidence burden of proof is required for the court to resolve disputed facts in a Megan's Law hearing regarding "the circumstances of the crime that has required registration as well as other criminal conduct in which the registrant has allegedly engaged." *E.B. v. Verniero,* 119 *F.*3d 1077, 1108 (3d Cir.1997), *cert. denied,* 522 *U.S.* 1110, 118 *S.Ct.* 1039, 140 *L.Ed.*2d 105 (1998), *cert. denied,* 522 *U.S.* 1109, 118 *S.Ct.* 1039, 140 *L.Ed.*2d 105 (1998). That burden of proof standard is required because a registrant's liberty interests in privacy and reputation are at stake, which triggers due process rights. *Id.* at 1105–1111; *Doe v. Poritz,* 142 *N.J.* 1, 106, 662 *A.*2d 367 (1995). But when there has been a conviction or an adjudication of delinquency, the Megan's Law judge is restricted to resolving "facts relating to the circumstances of a sex offense of which the registrant has been convicted ... [that were not] determined by the trier of fact in the criminal proceeding." *E.B. v. Verniero, supra,* 119 *F.*3d at 1108. For example, where a registrant has been convicted of a crime involving sexual penetration, the Megan's Law judge should assess the circumstances surrounding the offense—such as whether the act was planned beforehand or whether multiple objects were used to penetrate the victim but, the judge is prohibited from reconsidering whether sexual penetration in fact occurred. Hence, the Megan's Law judge may consider "the details of a sexual offense, which is not the subject of a conviction, ... in the risk assessment scale calculus." *In re C.A.,* 285 *N.J.Super.* 343, 347–48, 666 *A.*2d 1375 (App.Div.1995), *aff'd* 146 *N.J.* 71, 679 *A.*2d 1153 (1996). The Megan's Law judge, however, is not permitted to reexamine or redetermine the elements of a sex offense for which a registrant has been convicted or adjudicated a delinquent.

By permitting a collateral attack on the adjudication of delinquency for violating *N.J.S.A.* 2C:14–2c(1), the majority has opened the floodgates to collateral attacks by *all* registrants claiming that one or more elements of an offense that triggered the Megan's

Law tier classification were not established by the guilty pleas or verdicts. Since there is no material difference between a collateral attack on a judgment adjudicating delinquency and a judgment of conviction for an adult, all juvenile and adult registrants will be entitled to wage such attacks on all convictions involved in the tier classification proceedings. Obviously, that will have a substantial negative impact on Megan's Law hearings. Such a draconian result is neither warranted nor wise. The purpose sought to be advanced by the majority's determination is to require Tier I notification for J.G. The Appellate Division achieved that same result without turning the law on its head. Hence, I would not permit a collateral attack.

## II.

Although I disagree with the Court's conclusion that a registrant may collaterally attack one or more elements of a sexual offense to which he or she has pled guilty, I fail to understand why the Court does not vacate J.G.'s judgment of delinquency given the Court's finding that sexual penetration has not been established—an element of the sex offense to which J.G. pled guilty. The Court has found that J.G. did not understand the meaning of "rape," "sex," or "penetration." *Ante* at 331, 777 *A*.2d at 908–09.

A guilty plea is an admission of all the elements of a formal criminal charge. When an accused pleads guilty to a criminal charge, he or she surrenders such fundamental rights as the entitlement to the privilege against self-incrimination and the right to confront witnesses against the accused. Those constitutional rights are so important that our Court Rules and cases prohibit a guilty plea from being entered "unless the court first satisfies itself that there is a factual basis for the plea and that the plea is made voluntarily and intelligently with an 'understanding of the nature of the charge and the consequences of the plea.'" *State v. Taylor*, 80 *N.J.* 353, 362, 403 *A*.2d 889 (1979) (quoting *Rule* 3:9–2); *see R.* 5:1–1; *State in Interest of G.W.*, 206 *N.J.Su-*

*per.* 50, 54, 501 *A.*2d 1012 (App.Div.) (applying *Rule* 3:9–2 to juveniles), *certif. denied,* 102 *N.J.* 355, 508 *A.*2d 224, 225 (1985).

When a guilty plea is made without a proper factual basis regarding each element of the offense, such a plea violates due process and is unconstitutional if the accused contemporaneously claims that he or she is innocent, or that he or she does not understand enough about the nature of the law as applied to his or her case to make a voluntary and informed decision concerning whether to plead guilty. *McCarthy v. United States,* 394 *U.S.* 459, 466–67, 89 *S.Ct.* 1166, 1171, 22 *L.Ed.*2d 418, 425–26 (1969); *State v. D.D.M.,* 140 *N.J.* 83, 95, 657 *A.*2d 837 (1995); *cf. Libretti v. United States,* 516 *U.S.* 29, 42, 116 *S.Ct.* 356, 364, 133 *L.Ed.*2d 271, 285 (1995). "[B]ecause a guilty plea is an admission of all the elements of a formal criminal charge, it cannot be truly voluntary unless the defendant possesses an understanding of the law in relation to the facts." *McCarthy, supra,* 394 *U.S.* at 466, 89 *S.Ct.* at 1171, 22 *L.Ed.*2d at 425.

By contending that his plea did not establish sexual penetration, J.G. is asserting his innocence to a violation of *N.J.S.A.* 2C:14–2c(1). The majority agrees when it concludes that J.G. did not knowingly admit to "sexual penetration" at the plea hearing because he did not understand the meaning of that phrase. I believe, under the Due Process Clauses of the Fourteenth Amendment of the Federal Constitution and under Article 1, paragraph 1 of the New Jersey Constitution, *see Greenberg v. Kimmelman,* 99 *N.J.* 552, 568, 494 *A.*2d 294 (1985), that the majority's holding obligates the Court to vacate the judgment adjudicating delinquency. "In these circumstances, where the responsible arms of the judicial ... establishment, together with [J.G.'s] own counsel, have misinformed him as to a material element of a plea negotiation, which [J.G.] has relied thereon in entering his plea, ... it would be manifestly unjust to hold [J.G.] to his plea." *State v. Nichols,* 71 *N.J.* 358, 361, 365 *A.*2d 467 (1976). The appropriate remedy under the majority's holding is to vacate the plea rather

than to find the absence of an essential element of the offense, but otherwise leave the adjudication intact.

## III.

I concur in the judgment of the Court in all other respects.

Justice LaVECCHIA joins in this opinion.

*For affirmance in part; reversal in part; and modification in part*—Justices STEIN, COLEMAN, LONG, LAVECCHIA, ZAZZALI, CARCHMAN, and WELLS—7.

*Opposed*—None.